**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WASHINGTON TEACHERS' UNION, LOCAL #6, AMERICAN FEDERATION OF TEACHERS, AFL-CIO, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| AMERICAN FEDERATION OF TEACHERS, AFL-CIO, | ) ) ) |
| Defendant. | ) ) |

Civil No. 1:10-cv-01387
Judge Kollar-Kotelly

**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUCTION
<u>AND FOR SETTING OF A HEARING</u>**

Washington Teachers' Union, Local #6 ("WTU") moves for a preliminary injunction in accordance with Federal Rule of Civil Procedure 65 prohibiting the American Federation of Teachers, AFL-CIO ("AFT") from suspending the autonomy of the WTU and interfering with the election of officers of the WTU on the basis of an unlawful and invalid union trusteeship. WTU asks the Court to set a hearing on this motion sufficiently **before September 18, 2010**, the date on which AFT will mail ballots for WTU officers to individuals on the June 30, 2010, membership list. In support of this motion, WTU files with this motion a memorandum in support; declarations and annexed exhibits, and a proposed order.

Counsel for AFT does not consent to the motion for a preliminary injunction, but asks for a hearing as soon as possible.

Date:   August 20, 2010                    Respectfully submitted,

                                           O'DONNELL, SCHWARTZ & ANDERSON, P.C.

                                           By:____/s/_Anton G. Hajjar_____
                                               Anton G. Hajjar
                                                  ahajjar@odsalaw.com
                                               Melinda K. Holmes
                                                  mholmes@odsalaw.com
                                               Brenda C. Zwack
                                                  bzwack@odsalaw.com

                                               1300 L Street N.W., Suite 1200
                                               Washington, DC 20005-4178
                                               (202) 898-1707/ FAX (202) 682-9276

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WASHINGTON TEACHERS' UNION, ) | |
| LOCAL #6, ) | |
| AMERICAN FEDERATION OF TEACHERS, ) | |
| AFL-CIO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 1:10-cv-01387-CKK |
| ) | |
| ) | |
| AMERICAN FEDERATION OF TEACHERS, ) | |
| AFL-CIO, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM IN SUPPORT OF APPLICATION
OF PLAINTIFF WASHINGTON TEACHERS' UNION
FOR A PRELIMINARY INJUNCTION**

Plaintiff Washington Teachers' Union Local #6, American Federation of Teachers AFL-CIO ("WTU") asks the Court to issue a preliminary injunction ordering the American Federation of Teachers, AFL-CIO ("AFT") to cease and desist the AFT's unjustified and unlawful interference with the internal affairs of the WTU in conducting an election for officers of the WTU. On its own initiative and without basis under the WTU's Constitution, the AFT has imposed two trusteeships on the WTU in order to take over all matters concerning WTU's internal officer election which was announced over a month ago. As a result, the AFT has confronted the WTU membership with the spectacle and confusion of two elections for the same positions, one scheduled by the WTU's Executive Board and announced to members on July 10, 2010, for voting in November and another scheduled by the AFT and announced to members on August 3, to take place two months earlier. The AFT has sought to supplant the judgment of the lawfully elected representatives of the WTU membership on its Executive Board with its own interpretation of the

WTU Constitution and perceived interests of WTU members.  As the Court of Appeals observed in *Monzillo v. Biller*, 735 F.2d 1456, 1458 (D.C. Cir. 1984), "An interpretation of a union constitution rendered by officials of a labor organization is entitled to considerable deference by a reviewing court and should not be overruled unless the court finds that the interpretation was unreasonable or made in bad faith."  The officials to whom this Court should defer are the elected representatives of the WTU membership.

When the WTU maintained its right to administer its own affairs, the AFT imposed an unlawful emergency trusteeship on the WTU to override the WTU's decision.  The WTU now comes to this Court to enforce its right to autonomy, which is a bedrock principle under the constitutions of both labor organizations and the federal law governing trusteeships.

As we show below, in addition to the practical concerns of the confusion caused by the AFT's unreasonable and ill-planned actions and the distraction and expense for the WTU managing the AFT's conduct while implementing a groundbreaking collective bargaining agreement, the AFT's conduct is unlawful and irresponsible.  It is plainly in violation of the trusteeship provisions of the Labor and Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 461-466 (2010), and the Constitutions of both the AFT and the WTU.  Most troubling, the process the AFT seeks to implement for the WTU election through its improper trusteeships is facially undemocratic, in violation of both the principles and provisions of the LMRDA and the parties' Constitutions.  Under the WTU's Constitution, voters must be members in good standing and currently employed as teachers.  The **AFT has decreed that the election cut-off date is June 30, 2010, which means that hundreds of non-WTU members who have left the Union through retirement and job terminations since June 30 will be allowed to vote while hundreds of newly hired teachers who have joined the WTU since June 30th will be**

**disenfranchised.**   And under the AFT's election rules, **these new members will never even receive a ballot** from the AFT to cast in the mail balloting to be conducted.  In addition, it will be impossible at the ballot count to identify non-members who are ineligible to vote, so challenges to these ballots will not be possible.  This deprivation of equal membership rights is intolerable.  Cf. Fisher v. Washington Teachers' Union, 350 F.Supp.2d 69 (D.D.C. 2004) (Kollar-Kotelly, J.) (disqualified candidate not deprived of equal rights of membership to run for office because candidate was not similarly situated with another candidate).[1]   The AFT would enfranchise hundreds of non-members with no discernible stake in the outcome of the election while disenfranchising hundreds of new members with a vital interest in the outcome of the election.

Under the AFT's schedule, ballots will be mailed to individuals on the June 30, 2010, membership list, creating the urgent need for Court action prior to that date. A table comparing the two dueling schedules is annexed as Attachment A:

This ruling is unlawful and threatens to subject both the WTU and the AFT to considerable liability and uncertainty in challenges to the election.   To avoid such harm while maintaining the legal and contractual due process requirements for trusteeship and union elections, the WTU asks the Court to enjoin the AFT's interference with the WTU's election pending a final decision on the merits of the WTU's claims.

A.  STATEMENT OF FACTS

The WTU represents teachers and other education-related employees in the D.C. Public School ("DCPS") system.  (Declaration of George Parker ("Parker Dec.") ¶ 2.)  The WTU is governed by officers and representatives who are elected by the membership every four years.  (Parker Dec. ¶

---

[1]   "Title I guarantees that "[e]very member of a labor organization shall have equal rights and privileges within such organization to nominate candidates [and] to vote in elections or referendums of the labor organization ... subject to reasonable rules and regulations in such organization's constitution and bylaws." 29 U.S.C. § 411(a)(1)."  Fisher at 76-77.

3.)  On July 1, 2010, the WTU's duly elected Executive Board promulgated an election schedule and voter eligibility criteria for the Union's internal officer elections.  (Parker Dec. ¶ 4.)  The election schedule set by the WTU Executive Board is:

1. Notice of the opening of nominations for the election of WTU officers, WTU Delegates to the Metropolitan Washington Council AFL-CIO and Delegates to the Maryland State/DC AFL-CIO will be sent to all members by the WTU Elections Committee - September 30, 2010

2. Deadline for submission of petitions - October 29, 2010

3. Balloting and election of WTU Officers - November 15 - November 30, 2010

4. Counting of ballots - November 30, 2010

(Parker Dec. ¶ 5.)  By letter dated July 1, 2010, the WTU notified all current union members of this schedule.  (Parker Dec. Exh. 2.)

All currently-employed teachers reported to DCPS for the 2010-2011 school year on Monday, August 16th, and classes begin on August 23rd.  (Parker Dec. ¶ 9.)  Teachers are intensely occupied at the beginning of the school year with preparations for the year and orientation of new students, materials, teaching standards, supervisors and colleagues, and a host of other matters.  (Parker Dec. ¶ 10.)  Among the current teachers starting the school year are over three hundred teachers new to DCPS, many of whom are also new to teaching.  (Parker Dec. ¶ 7.)  Additionally, the Union and its building and staff representatives are extremely busy with implementing a new groundbreaking collective bargaining agreement that significantly revises past work rules.  (Parker Dec. ¶ 11.)  Dozens of provisions of the new collective bargaining agreement require the WTU's active engagement in their implementation, including article establishing numerous committees, intensive professional development and support programs, and a revised grievance and arbitration procedure.  (Parker Dec. ¶ 11.)

The membership of the WTU is clearly set forth in its Constitution and By-Laws, which make it clear that **only members in good standing who are actively employed by DCPS are eligible to vote** in union elections.  (Parker Dec. ¶ 13.)  Specifically, the WTU Constitution and By-Laws state:

### CONSTITUTION ARTICLE III - MEMBERSHIP

All personnel employed or retired by the Board of Education, except officers charged with the assignment, scheduling, rating or promotion of such personnel and workers in other groups organized by the Union, shall be eligible for membership. Members of the Union staff who have been teachers shall be eligible for membership, but shall not be eligible to run for office unless a leave of absence is taken.

### BY-LAWS ARTICLE III – MEMBERSHIP

**Section 1.** Persons retired from the units of organizations may be continued in or be readmitted to membership.

**Section 2.** Any member who was in good standing while an employee of the Board of Education may retain his membership. …

### BY-LAWS ARTICLE IV - DUES

**Section 1.  …** Members who pay full dues shall vote on all issues concerning the Washington Teachers' Union and shall be eligible to run for elected office.

**Section 3.  …** Retiree members who pay Washington Teachers' Union Retiree Chapter dues shall vote only on Washington Teachers' Union Retiree Chapter issues.

(Parker Dec. Exh. 1.)

The past practice concerning voter eligibility – including when the AFT conducted a WTU election and when the U.S. Department of Labor conducted a rerun election – has been that those who are eligible to vote in officer elections are those who are members in good standing **currently employed by DCPS**.  (Parker Dec. ¶ 14.)  The WTU Constitution is explicit that retirees who maintain retiree membership may vote **only** on matters affecting retirees.  (Parker Dec. ¶ 15.)  The

AFT acknowledges and accepts that it takes up to three to four pay periods after the start of a school year for the WTU to obtain a reasonably accurate membership list that includes new members hired in the spring and summer, but does not include members who retired or were terminated over the spring and summer.  (Parker Dec. Exh. 5 at  5.)

The WTU Constitution and By-Laws establishes an Elections Committee which is charged with the following specific duties: notify all members of the opening of nominations for office (Article VII, Section 2(A)); certify that all nominating petitions have been properly signed by twenty members in good standing before placing the names on the ballot (Article VII, Section 2(D)); provide information concerning all presidential candidates for an edition of the WTU's newsletter (Article VII, Section 2(E)); provide a recommendation to the Executive Board regarding which outside agency to use to run the election, e.g. the Federal Mediation and Conciliation Service or the AAA (Article VII, Section 2(H)); and if necessary use an outside agency to conduct an run-off election between the two candidates (Article VII, Section 2(K)).  (Parker Dec. ¶ 17.)  In comparison, the WTU Executive Board holds the second highest authority in the WTU leadership after the membership.  (Parker Dec. ¶ 18, Exh. 1 at Article V.)  The Executive Board has broad authority to take such action as may be necessary between representative assembly or membership meetings to govern the WTU.  (Parker Dec. ¶ 19, Exh. 1 at Article V, Section 2(D)(2).)

On June 25, 2010, the WTU Executive Board reached a determination regarding the meaning of the WTU Constitution and By-Laws and an election schedule.  Up to this point there was an internal dispute within the WTU as to whether the Elections Committee or the Executive Board should set the schedule for the election given the fact that the dates in the Constitution and By-Laws had already passed.  The Executive Board's determination settled the issue, and WTU President George Parker wrote to AFT President Randi Weingarten to announce the WTU's

decision.  Parker Dec. ¶ 22, Exh. 6.  Previously and prior to Executive Board's decision regarding the interpretation of the WTU Constitution and By-Laws, AFT General Counsel David Strom responded to an inquiry from General Vice President Nathan Saunders regarding the WTU election process:

> …AFT does not become involved in local internal election issues until it is clear that the parties have exhausted their avenues for redress at the local level.  In this instance, the WTU Executive Board has the explicit and inherent authority to interpret and enforce the WTU Constitution and Bylaws.  Until the Board has acted, it would be premature for AFT to become involved in this dispute…

(Parker Dec. ¶ 23, Exh. 7.)  Earlier, in a June 4, 2010, e-mail to declared WTU presidential candidates George Parker, Nathan Saunders, Elizabeth Davis, and Elections Committee Chair Claudette Carson, Weingarten wrote:

> As you know, WTU elected its Delegates to the AFT Convention and members of its Election Committee last Thursday, May 27, 2008 [sic], in an election process that was fair, transparent and without acrimony.  AFT's limited role in monitoring and assisting with the election of the Election Committee ended with the certification of the results by the AAA.  The duly-elected Elections Committee now has responsibility for conducting the election of officers as described in the WTU constitution and bylaws.  Therefore, it is neither necessary nor appropriate to include me and other AFT staff in each communication about the local's internal election process.

Parker Dec. ¶ 24, Exh. 8.

Under the AFT Constitution, the grounds and procedures for establishing a trusteeship to strip a local union of its autonomy are specifically limited and detailed in Article VI. The section of Article VI pertaining to administratorships (trusteeships) is Section 15, which states in relevant part:

> **Section 15. (a)  Grounds**.  In exceptional and unusual circumstances where an AFT state or local affiliate is incapable of taking adequate remedial measures on its own initiative, the AFT may establish an administratorship for the purpose of:

(i) restoring the rights of members in situations where there has been a significant failure either in election procedures or representation required under the AFT or affiliate constitution(s); or

(ii) correcting financial malpractice or misappropriation or loss of funds.

**Section 15. (b) Process for Approval of an Administratorship**.   Where the executive council has reason to believe that the grounds set forth in paragraph (a) above exist to consider an administratorship, the president shall be authorized to appoint a committee of the council to investigate and conduct a hearing.   That hearing shall be scheduled within 30 days, at which time the affected parties will be able to appear and present evidence, witnesses and arguments.   Notice of such hearing and a written statement of the grounds for the proposed administratorship will be provided to the affected local or state federation before the hearing.   The committee shall submit its findings and recommendations to the council for final approval.   Thereafter, the executive council, by a two-thirds vote, shall have the power to authorize the president to establish an administratorship and appoint an administrator.   In situations where an administrator has been approved, the members of the affected AFT affiliate will be notified of the reasons for such decision, including an explanation of the administrator's duties and functions.

**Section 15.   (c) Emergency Administratorship**.   Under grounds pursuant to Article VI, Section 15(a), the AFT president, upon unanimous decision of the AFT president, is authorized to invoke an emergency administratorship in situations requiring immediate action for the purposes of securing and safeguarding an affiliate's assets and vital records from immediate threat, provided that the executive council by a two-thirds vote approves such emergency action within five business days of its having been invoked.   Within 24 hours thereafter, the president shall appoint a committee of the council in keeping with Article VI, Section 15(b) of the AFT constitution, to investigate and conduct a hearing; and the normal processes, timetables, hearing rights and approval requirements under Article VI, Section 15(b) of this constitution shall apply.

At AFT President Weingarten's direction, the AFT instituted an investigation of the WTU under Article VI, Section 14(b) of the AFT Constitution.  Section 14(b) states:

The executive council may, by a two-thirds vote, authorize the president to appoint a committee to investigate a local or state federation where an election appears to have been conducted in violation of the local or state federation, constitution, the AFT constitution or applicable federal law or a local whose conduct is not in harmony with the principles of the AFT and tends to bring the AFT into disrepute or a local that fails to maintain affiliation mandated in Article XI, Section 2 and 3. The local or state federation shall be given an opportunity to present its position to the committee.  The committee shall be given an opportunity to present its position to the committee.  The committee shall submit its findings and recommendations to

8

the council, which shall have the power to take action to resolve the matter, including the imposition of the penalty contained in Article XI, Section 3, of this constitution and/or other appropriate penalties.  The action of the council in such cases shall be final.  The cost of s such investigation shall be borne by the national office.

With regard to local union elections, the Article IV, Section 5, of the AFT Constitution states:

All locals and state federations shall submit three copies of their constitution and bylaws to the national organization within three months of receiving their charter or as of September 1, 1955, whichever is the later date, and the shall similarly submit all subsequent amendments to their constitution and bylaws.  No such constitution or bylaws shall be in conflict with the constitution of the American Federation of Teachers.  Effective September 1, 1994, and thereafter, the constitution and bylaws of each affiliated local and state federation shall provide for regular meetings of an executive body and regular meetings of the general membership or a representative body of the general membership.  The conduct of elections shall be consistent with the standards for such elections developed under the Labor-Management Reporting and Disclosure Act (LMRDA).  Terms of office for officers shall not exceed four years, or fewer if required by applicable state or federal laws.

Asserting its authority under Article VI, Section 14(b), the AFT appointed a committee and held a hearing, but the WTU was not invited to participate.  Instead, the AFT invited the previously declared WTU presidential candidates George Parker, Nathan Saunders, Elizabeth Davis and Elections Committee Chair Claudette Carson to participate.  The notice of hearing set forth ground rules that the invited parties were not allowed to cross examine witnesses, but were limited to presenting testimony and related documentary exhibits to the committee.   Specifically, the committee was charged with investigating just four issues:

1.  When should the internal elections for officers and members of the Executive Board of the WTU take place in light of the fact that the precise dates set out in the WTU Constitution and Bylaws for the election could not be met this year because there was not a duly constituted Elections Committee in place to start the process in the spring of 2010?

2.  Whether the April 30th deadline for submitting nominations petitions set forth in the WTU Constitution and Bylaws should be followed in light of the fact that there was no duly constituted Elections Committee at that time and the Committee had not sent out the Notice of Nominations to the membership?

3.  What is the universe of WTU members who should be eligible to participate in the internal WTU election and should that universe include individuals who were excessed on June 30, 2010?[2]

4.  Whether the recent suspension of salary and leave actions by the WTU President and Executive Board against General Vice President Saunders improperly impairs Saunders' ability to run for WTU office?

On August 4, 2010, following the hearing, the AFT ordered, among other things, that: "AFT will take charge of the 2010 internal elections for the WTU.  This election will include the Officers, Executive Board Members, Trustees, Delegates to the Metropolitan Labor Council and Delegates to the Maryland State and D.C. AFL-CIO."  On August 3, the day before the order, the AFT sent notices to some WTU members announcing the opening of the period for candidate petitions to be submitted and a new election schedule.  Under the AFT's schedule, a fifteen (15) day voting period commences with the mailing of ballots on September 18, 2010, with ballots to be opened and counted on October 4, 2010, by the American Arbitration Association ("AAA").

By letter dated August 13, 2010, the WTU requested the AFT Executive Council to reconsider this decision and order.  On August 16, 2010, the AFT denied the request and stated its intention to **impose an immediate emergency administratorship (trusteeship)** in the absence of sworn statements by WTU's president and Executive Board by noon on August 17 that it will cede control over its own elections to the AFT.  As specifically threatened by the AFT:

Unless by noon on Tuesday, August 17, 2010, we receive an unequivocal sworn undertaking from you and the Executive Board of the Washington Teachers Union, Local #6 ("WTU"), to comply in all respects with and to fully cooperate in all good faith with the processes previously articulated thereunder, an Administratorship

---

[2]     All agree that "excessed" teachers who remain on the DCPS rolls are eligible to vote.  Excessed teachers are those who are displaced from their assigned schools and are seeking placement in other locations.  Under the applicable collective bargaining agreement, they remain on the rolls at least for one school year (we say "at least" because there is a disagreement between WTU and DCPS about whether these displaced teachers were excessed under the new or previous contract.  If they have been excessed under the prior contract their right to placement does not expire.  Excessed teachers with an "effective rating" are guaranteed at least one year under the new contract.  They remain eligible to vote as long as they are still on DCPS payroll. Excessed teachers with a "minimally effective" rating could be terminated if they fail to find a placement by August 22, 2010.

shall, upon the unanimous decision of the President, Secretary-Treasurer and Executive Vice President of the AFT, be established and an administrator appointed effective forthwith and without further notice to restore the rights of the members in election procedures or representation, to secure and safeguard the vital records and assets of the WTU from immediate threat, and to take such actions as are necessary to protect the interests of the membership, in accordance with Article VI of the Constitution and Bylaws of the American Federation of Teachers, AFL-CIO, particularly Sections 14 and 15 and each of the subsections thereof, and the applicable provisions of law.

On August 17, 2010, AFT President Weingarten wrote to WTU President Parker that the AFT's Executive Council allegedly voted to ratify the imposition of a "limited administratorship" over the WTU, appointing Al Squire, director of AFT Southern Region, as administrator.   It continued: "We will be in touch with D.C. Public Schools (DCPS) to make the necessary arrangements to move the election forward."   A copy of a letter to WTU members was attached.   It is unclear the extent to which the AFT will assert its alleged representational rights with DCPS.   At a minimum, this contact will cause confusion at DCPS over which officials have the legal right to speak for the WTU.

## II.  ARGUMENT

The requirements for provisional injunctive relief are that the moving party must demonstrate (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006); see Hall v. Daschle, 599 F. Supp. 2d 1, 6 n.2 (D.D.C. 2009) ("[t]he same standard applies to both temporary restraining orders and to preliminary injunctions").   The WTU easily meets this standard.

### A.    The WTU Has A Significant Likelihood of Success on the Merits of its Claims Against the AFT.

The WTU has alleged two general ways in which the AFT has violated the law, namely the AFT's violations of the LMRDA's due process requirements for trusteeships and breaches of the unions' constitutions, on which it has a significant likelihood of succeeding in demonstrating.  In accordance with the LMRDA, the AFT's assumption of control over the WTU's election meets the definition of a "trusteeship" in 29 U.S.C. § 402(h).  Accordingly, it was required to comply both with the requirements of the LMRDA as set forth in 29 U.S.C. § 462[3] and 29 U.S.C. § 464(c)[4] as well as the AFT Constitution for imposing a trusteeship.  The manner in which the AFT has imposed this trusteeship failed, however, to comply with many provisions of its Constitution and the requirements of the LMRDA by, for example, failing to give adequate pre-hearing notice that a result of the AFT's investigation could be the AFT's taking control of the WTU's election; conducting a hearing with a pre-ordained outcome; prohibiting cross-examination of witnesses at the hearing; failing to rule on critical issues identified by the AFT before the hearing of whether the WTU Executive Board had the authority to interpret the WTU Constitution in the circumstances presented; relying on Article VI, Section 14(b) of the AFT Constitution to justify its constructive trusteeship despite that provision being limited by its terms to post-election reviews; failing to employ the procedures in the AFT Constitution for imposition of an trusteeship; and allowing non-members of the WTU to vote while disenfranchising members who are eligible to

---

[3]      "Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization."

[4]      "In any proceeding pursuant to this section a trusteeship established by a labor organization in conformity with the procedural requirements of its constitution and bylaws and authorized or ratified after a fair hearing either before the executive board or before such other body as may be provided in accordance with its constitution or bylaws shall be presumed valid for a period of eighteen months from the date of its establishment and shall not be subject to attack during such period except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section  462 of this title."

vote under the WTU Constitution.  On this list alone, therefore, preliminary injunctive relief is justified on the WTU's showing of a likelihood of success on the merits of its claims.

1.  <u>LMRDA Due Process Violations – Improper Purpose and Invalid Hearing</u>

The method and manner by which the AFT has seized control of the WTU's election of officers violates the LMRDA.  The AFT's August 4th "Order" completely taking over the WTU's election from its Executive Board and Election Committee and dictating that the Union make certain personnel decisions and payments constitutes a trusteeship within the meaning of the LMRDA because in doing so the AFT has suspended the WTU's autonomy under its constitution and bylaws.  29 U.S.C. § 402(h) ("any receivership, trusteeship, or other method of supervision or control whereby a labor organization suspends the autonomy otherwise available to a subordinate body under its constitution or bylaws.").  The LMRDA is explicit in limiting trusteeships **"only"** to specified situations:

> Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization.

29 U.S.C. § 462.  The LMRDA also requires a parent organization to establish a trusteeship "in accordance with the procedural requirements of its constitution and bylaws and authorized or ratified after a fair hearing…."  29 U.S.C. § 464(c).  In *Local Union 13410, United Mineworkers of America v. United Mineworkers of America*, 475 F.2d 906, 915 (D.C. Cir. 1973), the Court of Appeals summarized the LMRDA's requirements, and the effects of failure to provide a fair hearing, as follows:

> For future guidance to unions attempting to abide by the law and courts reviewing union activity, our holding on this point may be summarized as follows. Absent a

> reasonable belief in the necessity for immediate action, all practical steps must be taken to afford a hearing *before* a trusteeship is imposed.  A trusteeship may be imposed without a hearing only where a parent union could reasonably believe that an emergency situation does not allow time for such a hearing. Even in such emergency situations, at the time the trusteeship is imposed a hearing should be scheduled for the earliest practicable date thereafter. If the parent union does not comply with these requirements, any trusteeship will be treated as void *ab initio*.

See Retail Clerks Union, Local 770 v. Retail Clerks International Association, 479 F.2d 54, 55 (9th Cir. 1973) (denying international union's request for an injunction to enforce its emergency trusteeship of a local union, and holding that a trusteeship is an "extraordinary intrusion into the affairs of a local union" which "should not be taken without a prior hearing, absent some necessity for immediate action"); Retail, Wholesale, Department Store Union v. National Union of Hospital and Health Care Workers, 577 F.Supp. 29, 33 (S.D. N.Y. 1984) (denying international union's request for injunction to enforce its emergency trusteeship, and holding that an "emergency" in the context of a trusteeship "connotes a situation 'developing suddenly and unexpectedly and demanding immediate action,'" quoting the American Heritage Dictionary (New College Edition 1976)).

Moreover, the LMRDA requires certain basic procedures be followed in investigating and imposing a trusteeship to ensure due process has been provided.  "A fair hearing has three minimum requirements: (1) notice of charges; (2) presentation of evidence and witnesses, and (3) an opportunity for cross examination."  Boilermakers v. Local Lodge D238, 865 F.2d 1228, 1236-37 (11th Cir. 1989); *see* Jolly v. Gorman, 428 F.2d 960, 967-68 (5th Cir. 1970), *cert. denied*, 400 U.S. 1023 (1971).

The AFT purports to be acting for the purpose of "restoring democratic procedures" but in fact the WTU's election procedures are entirely democratic – indeed, more democratic than those the AFT is implementing.  The WTU established and had begun implementing an election

schedule which would conclude with voting in November.  Individuals had already declared their candidacy before the AFT's intrusion, and procedures and plans were in place to obtain the most up-to-date membership information in order to verify nominating petitions, mail notices, mail ballots, and otherwise conduct the election.  The omissions which the AFT's decision noted in the WTU's notice to members about nominating petitions were minor at most; in any case, they are not a basis for the AFT's taking over the entire election and rescheduling the election deadlines *earlier*.  In fact, the AFT's decision acknowledged and accepted much of the WTU's reasoning behind its election procedures; the AFT just concluded it had a better plan.  The AFT's conclusion, however, that the WTU's democratic procedures could be improved upon is not a legitimate basis under the LMRDA for a trusteeship justified on restoring non-existent procedures.

The AFT also failed to satisfy the prerequisites for a fair hearing.  The AFT conducted what it described as "fact-finding and <u>not</u> an adversary" hearing in support of its trusteeship which failed to satisfy legal requirements in a number of respects.  First, the Notice of Hearing nowhere informed the WTU that an outcome of the hearing could be a trusteeship.  Second, a critical issue - indeed one which initiated the AFT's unwanted involvement - was the disagreement between the WTU's Election Committee and Executive Board over which body was empowered by the WTU constitution to set an election schedule.  The Elections Committee took the position that only candidates who had submitted nomination petitions by the last regular working day in April were eligible to run for office, and that the timing of an election should take place with reference to that date.  Not even the AFT agreed with this conclusion because, as the AFT found, a validly-elected Elections Committee had not been seated until May 27, 2010, well after the constitutional election dates.  The AFT, like the WTU's Executive Board concluded rather that "it is apparent that the deadline of April 30th set for in the WTU By-Laws is wholly inapplicable." (Parker Dec. Exh. 5 at

5.) The WTU's Executive Board acted only after it obtained a legal opinion from its attorney that the Executive Board had authority to set election dates under the WTU constitution. The AFT does not question that this legal opinion was requested, given, and relied upon in good faith. But rather than resolve the issue it posed about the disagreement over the interpretation of the WTU's Constitution, the AFT ducked the issue by simply decreeing its own rules on eligibility and dates for the election wholly independent from any facts presented to or detailed by the AFT.  By failing to even attempt to answer the issue noticed by the AFT of authority under the WTU's constitution which the WTU and others addressed at the hearing, and instead simply instituting its own results without advance notice, the process which resulted in this trusteeship is fatally flawed under the LMRDA.   Third, cross-examination was not permitted at the hearing resulting in the WTU's trusteeship by the AFT.  Ultimately, the outcome of the hearing was exactly the same as what the AFT President had opined *prior* to the hearing should be the result, suggesting that the hearing was a purposeless exercise for the WTU and the outcome was predetermined by the AFT without any evidence.  Accordingly, these failings in the hearing procedures render the trusteeship "void *ab initio*."  Mineworkers, *supra.*

## 2.   Contractual Breaches – Violations of the Union Constitution

The AFT's imposition of a trusteeship over the WTU's election and threat to impose a total administratorship is also in clear violation of the WTU Constitution and By-Laws and the AFT Constitution.  The AFT's August 4, 2010,  decision and order and ensuing conduct of seizing control of the WTU elections process and directing the WTU to restore General Vice President Saunders' salary and take steps to secure authorization of his leave is in clear violation of the AFT Constitution and the WTU Constitution and By-Laws.[5]  By stripping the WTU of its local

---

[5]        Saunders has filed an action in D.C. Superior Court seeking, among other things, restoration of his $131,000 salary and his leave of absence from DCPS.  Saunders. v. Washington Teachers Union, Civ. No. 000485-10.  The

autonomy to interpret its own constitution and bylaws, conduct its internal election, and hold its officers accountable, the AFT has imposed an illegal constructive trusteeship over the WTU. The imposition of this trusteeship is in violation of the AFT and WTU Constitution and By-Laws and the LMRDA, which is incorporated in both constitutions.

The AFT has not and cannot establish sufficient grounds to impose an administratorship to strip a local union of its autonomy under the applicable Article VI, Section 15(a) of the AFT Constitution. By its own terms, the application of this section is limited to "exceptional and unusual circumstances where an AFT state or local affiliate is incapable of taking adequate remedial measures on its own initiative." Section 15(a) establishes two grounds for the imposition of an administratorship over an autonomous local union, "correcting financial malpractice or misappropriation or loss of funds" or correcting "a significant failure either in election procedures or representation required under the AFT or affiliate constitution(s) …." Because there is no question that WTU's finances are sound and that there has been no malpractice or misappropriation or loss of funds as required by Section 15(a)(ii), the AFT presumably intends that grounds for its assertion of control over the WTU exist under Section 15(a)(i) regarding restoring rights impinged upon by grossly improper election procedures. As noted, however, the dispute here came down to a difference of opinion between the AFT and the WTU's Executive Board on which body – the Executive Board or the Elections Committee -- had the authority to set an election schedule and eligibility rules in circumstances where the constitutional timeline could not be met. The AFT did not and cannot demonstrate that the Executive Board's judgment on these points amounts to a "significant failure in election procedures … required under the [WTU] constitution[]." Indeed, as shown elsewhere in this brief, the AFT's order constitutes a "significant failure in election

Superior Court does not have jurisdiction over this action; rather, the D.C. Public Employee Relations Board ("PERB") has exclusive jurisdiction over his complaint. <u>Fraternal Order of Police, MPD Labor Committee v. Public Employee Relations Board</u>, 516 A.2d 501, 505 (D.C. 1986). Saunders has not filed a complaint with the PERB.

procedures" because it enfranchises individuals who have retired or been separated from DCPS and who therefore will not be WTU members at the time of the election, and disenfranchises new members recently hired by DCPS.

According to the AFT Constitution, moreover, in order to establish grounds for an administratorship under Section 15(a)(i), the AFT must show that the WTU is "incapable of taking adequate remedial measures on its own initiative" to restore the rights of the members where there has been a "significant failure either in election procedures or representation required under the AFT or affiliate constitution(s)."

The parties agree that the WTU election process was thrown off the time-line prescribed by the WTU By-Laws for conducting officer elections. According to the WTU Constitution and By-Laws, officer elections must be held in May. That did not happen this year because there was no Elections Committee in place to open nominations and accept nomination petitions in April. The AFT was aware of this problem, however, and **with the WTU's consent** assisted the WTU by running an election of members to the Elections Committee. This process was not completed until May 27, 2010. At that time, AFT President Randi Weingarten stated unequivocally that the AFT's involvement in the WTU's internal election process had come to an end. Thus, the AFT was well aware that the initial timeline was off track, but considered the matter resolved to its satisfaction.

After the Elections Committee was elected on May 27, 2010, the question arose of which body should be responsible for setting a new election schedule, the Executive Board or the Elections Committee. According to the WTU Constitution and By-Laws, the Elections Committee is not broadly charged with managing all aspects of the election process, but instead has specific ministerial duties such as notifying members of the opening of nominations for office and certifying the completeness of nominating petitions. Other than to recommend to the WTU

Executive Board which outside agency to use to run the election, the Elections Committee makes no actual decisions regarding election procedure.  Consistent with its ministerial role and the fact that they are already set in the By-Laws, the WTU Constitution and By-Laws do not authorize the Elections Committee to set an election schedule.  But the question remained as to which of them should establish a schedule if the By-Laws' timeline could not be followed.

Although the Elections Committee's duties are limited, the authority of the WTU Executive Board is broad.  Thus, after considering the WTU Constitution and By-Laws and requesting and obtaining a legal opinion from WTU counsel, the WTU Executive Board determined that the Executive Board and not the Elections Committee had the authority to set an election schedule.  Accordingly, the WTU Executive Board set an election schedule, which it publicized to the membership on July 1st.  The Executive Board based the election schedule on the undisputed fact that it is not possible to obtain an accurate membership list during the summer.  This is a matter of particular concern because of a recent election faulted by the Department of Labor for having been conducted without an accurate membership/eligibility list.   Without an accurate membership list, the WTU would surely face the same legal challenges as arose in the earlier election.  Thus, in the carefully considered opinion of the WTU Executive Board, the earliest possible time to conduct a fair and democratic election would be to wait until the start of the school year.

In order to have an accurate membership list to verify nominating petitions, the WTU Executive Board set September 30 as the date to open nominations.  According to Article VII, Section 2(D) of the WTU By-Laws, nomination petitions are due 30 days later.  Thus, the WTU set October 29, 2010 as the date by which petitions must be submitted.  Article VII, Section 2(I) requires ballots to be mailed 15 days later; so the WTU set the date for mailing ballots at

November 15 and permitted the members until November 30, 2010 to return their ballots by mail. Ballots would then be counted on November 30.

AFT President Weingarten disagreed with the WTU's interpretation of its constitution and bylaws and the action it took pursuant to that interpretation.  The AFT ordered an investigation, the result of which was the August 4, 2010, decision and order by the AFT Executive Council to seize control of the WTU election, commence the nominations process immediately by permitting the submission of new nominations and upholding the validity of previously submitted nomination petitions, setting an eligibility cut-off date for participation in the WTU election at the last pay period in June of 2010, and ordering the WTU to restore Saunders' salary and take steps to obtain authorization for his leave from the classroom.   (Parker Dec. Exh. 5)   In reaching this determination, the AFT did not address the central question of whether the WTU Executive Board had the authority to interpret the WTU Constitution and By-Laws and, if so, why the AFT should not defer to WTU's interpretation of its own bylaws as authorizing the Executive Board to set an election schedule.  As the D.C. Court of Appeals observed in *Monzillo v. Biller*, 735 F.2d at 1458, "An interpretation of a union constitution rendered by officials of a labor organization is entitled to considerable deference by a reviewing court and should not be overruled unless the court finds that the interpretation was unreasonable or made in bad faith."  Under the law, the AFT has no basis to substitute its judgment for that of the WTU Executive Board; under the AFT Constitution, the WTU took remedial action sufficient to negate any need for a trusteeship.

The AFT has now purported to impose a second "emergency" trusteeship, action that is also in violation of the AFT's Constitution.   Article VI, Section 15(c) (entitled "Emergency Administratorship") is limited to "situations requiring immediate action for the purpose of securing and safeguarding an affiliate's assets and vital records from immediate threat …."  No such situation

exists here.  This case does not involve financial improprieties by the WTU or its officers.  The AFT has not identified any "vital records" which are under "immediate threat."

There is no genuine emergency justifying a trusteeship without regard to the hearing requirements of LMRDA.  See Retail Clerks Union, Local 770, 479 F.2d at 55; Retail, Wholesale, Department Store Union, 577 F.Supp. at 33 (discussed above).  In any case, the AFT has explicitly justified its emergency trusteeship solely on the WTU's defiance of its initial constructive trusteeship which the WTU has demonstrated is unlawful.  Even if the AFT followed its procedures for an emergency administratorship, in this instance the AFT should not be permitted to use it to rationalize the AFT's underlying unlawful conduct.

In addition, the AFT Constitution mandates that officer elections be conducted consistent with the LMRDA.  As the AFT and the WTU know from experience, the AFT's order and plan to use an out-of-date membership list for eligibility to vote, mailing ballots, and mailing notices that the AFT knows includes hundreds of non-members and excludes hundreds of recently-added new members violates both the explicit and implicit requirements of the LMRDA.  The AFT's order that the WTU restore the salary of its General Vice President – who is also a candidate for office – when the WTU knows it cannot account for the Vice President's time threatens to run afoul of LMRDA requirements that unions not put resources towards individuals' candidacies.  Accordingly, the substance of the procedure the AFT is imposing on the WTU violates the election requirements of the LMRDA, as incorporated and applicable to the AFT by virtue of its Constitution.

B.      The AFT's Actions Are Causing Irreparable Harm

The AFT's interference with the WTU's internal election processes is causing, and if it continues will cause, irreparable harm to the WTU and its membership.  Suspending the WTU's

autonomy and displacing the authority which the WTU membership has placed in its Executive Board in accordance with its Constitution and By-Laws, and communicating with the WTU membership information directly contrary to the decisions of their duly elected Executive Board, causes irreparable harm to the WTU.   Moreover, the AFT's actions threaten to undermine the authority and reputation of the WTU in the estimation of its members and the management of DCPS.   "As elected officials of the District Council removed from office as a result of the imposition and continuation of the trusteeship, the plaintiffs have established irreparable harm. The trusteeship bars the elected District Council members from performing those duties which they were elected to perform. A fundamental right which LMRDA was enacted to protect is a local union's right of self-determination.  … It has been held that damage to a labor union's reputation and image constitute irreparable injury."   Mason Tenders Dist. Council v. Laborers' Int'l Union, 884 F.Supp. 823, 832 (S.D.N.Y. 1995); see Satink v Hoffa, 2005 WL 2007250 at *12 (N.D. Ill. 2005) (interference with local union election constitutes irreparable harm).

The AFT's actions also cause a truly irreparable and indefensible harm to the individual teacher-members of the WTU who will be denied their right of franchise either by their disqualification by the AFT or sheer confusion over the election process.   Among the wrongly disenfranchised are newly hired teachers, over 300 of whom have joined the WTU only days ago on August 13, 2010, but who will not be permitted to vote in the election under the AFT's arbitrary June eligibility cut-off date despite their obvious interest in who will administer the union which represents them.   On the other hand, under the AFT's voter eligibility rules, hundreds of teachers who have retired or been separated from DCPS will be eligible to vote, even though they will not

be members of the WTU when they cast ballots and have no stake in the outcome of the election.[6]

In these circumstances, the AFT's assertion that its order is intended "to restore the rights of the

members in election procedures or representation" has the situation exactly backwards and

defames the elected officers of the WTU whom the membership elected to govern the union in

their interests and who established rules consistent with the WTU's democratic history.

        C.      <u>The WTU's Position Serves the Public Interest</u>

        The public interest is ill served by the AFT's interjecting itself into the WTU's orderly

processes.  The interference by the AFT in the WTU's internal affairs is an unnecessary distraction

and concern for teachers at their busiest time of the school year.  Having just reported to work on

August 16th and having already received conflicting and confusing information from the AFT about

Union elections which are likely to be of significant interest to many teachers, the AFT's actions

threaten undermine meaningful participation in the election as either candidates or voters.  At the

same time, the WTU's groundbreaking collective bargaining agreement with DCPS requires the

intensive attention of WTU officers and staff to be implemented.  The AFT is pulling the WTU away

from this priority and unfairly burdening those officers who are also candidates with the AFT's

unjustified battle to control the WTU's election.

        D.      <u>There Is No Harm to the AFT in the Court Granting the WTU an Injunction.</u>

        No harm will befall the AFT if an injunction is granted.  The members who the AFT

purports to protect are members of the WTU, and those members speak most authoritatively

through their elected officers and Executive Board, not the National AFT, which is far removed

from the needs and desires of WTU-represented teachers.  The potential damage to the AFT is one

of principle, namely preserving the democratic principles at work in the WTU election.  But

---

[6]      Under the election rules of the National Labor Relations Board, employees must continue to be employed on the date of the election.  *Plymouth Towing Co.*, 178 NLRB 651 (1969) ("[E]mployees employed on the eligibility date and on the date of election are eligible to vote ….").

because the WTU's election process protects that principle as well as, if not better, than the process being forced upon the membership by the AFT, there is no harm to the AFT in being enjoined.

### III. CONCLUSION

For these reasons and those appearing in the record as a whole, the WTU respectfully requests the Court to enter the temporary restraining order accompanying this memorandum, including relief from the bond under Rule 65(c) of the Federal Rules of Civil Procedure.

Date:   August 20, 2010               Respectfully submitted,

                                    O'DONNELL, SCHWARTZ & ANDERSON, P.C.

                                    By:____*/s/  Anton G. Hajjar*_____
                                       Anton G. Hajjar
                                         ahajjar@odsalaw.com
                                         Brenda C. Zwack
                                         bzwack@odsalaw.com

                                         1300 L Street N.W., Suite 1200
                                         Washington, DC 20005-4178
                                         (202) 898-1707/ FAX (202) 682-9276

APPENDIX A

| Election Schedule | | | | |
|---|---|---|---|---|
| AFT | | | WTU | |
| 8/3 | Opening of Nominations | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| 9/3 | Petitions due | | | |
| | | | | |
| | | | | |
| 9/18 | Ballots mailed | | | |
| | | | | |
| | | | | |
| | | 9/30 | Opening of Nominations | |
| 10/4 | Ballots counted | | | |
| | | | | |
| | | | | |
| | | | | |
| | | 10/29 | Petitions due | |
| | | | | |
| | | | | |
| | | 11/15 | Ballots mailed | |
| | | | | |
| | | | | |
| | | | | |
| | | 11/30 | Ballots counted | |
| | | | | |
| | | | | |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WASHINGTON TEACHERS' UNION, LOCAL #6, AMERICAN FEDERATION OF TEACHERS, AFL-CIO, <br><br>     Plaintiff, <br><br>         v. <br><br> AMERICAN FEDERATION OF TEACHERS, AFL-CIO, <br><br>     Defendant. | Civil No. 1:10-cv-01387 <br> Judge Kollar-Kotelly |

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of August, 2010, I caused the foregoing documents to be field using the CM/ECF and that ECF will send notification to all counsel of record.

Respectfully submitted,

Anton G. Hajjar