IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WASHINGTON TEACHERS' UNION, LOCAL #6, AMERICAN FEDERATION OF TEACHERS, AFL-CIO, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) ) | Civil No. 1:10-cv-01387-CKK |
| AMERICAN FEDERATION OF TEACHERS, AFL-CIO, | ) ) ) ) |
| Defendant. | ) ) |

**REPLY OF WASHINGTON TEACHERS' UNION
TO OPPOSITION OF AMERICAN FEDERATION OF TEACHERS
TO MOTION FOR A TEMPORARY RESTRAINING ORDER**

Plaintiff-counterclaim defendant Washington Teachers' Union Local #6, American Federation of Teachers, AFL-CIO ("WTU") replies to the opposition of defendant-counterclaimant American Federation of Teachers, AFL-CIO ("AFT") to the WTU's motion for a temporary restraining order as follows:

1. The AFT argues that "this is not a dispute between two institutions differing as to the meaning of the WTU Constitution." (AFT Opp. at 3.) The AFT is wrong – this is precisely what the dispute is about. The AFT and the WTU share a common conviction that an election for the WTU officials should be conducted as soon as possible. We have demonstrated that the election schedule adopted by the WTU Executive Board is the earliest that a **valid** election can be conducted, that is, one in which **all** eligible voters will have an opportunity to vote. To evade the **undisputed** fact that it will take several pay periods after the start of the school year to have a reliable membership list, the AFT proposes to use an obsolete list which it knows includes non-

1

members who have departed DCPS and therefore are ineligible to vote, and excludes new members who are eligible to vote. This cannot be a measure "restoring the rights of members" of the WTU. No deference is owed to such an undemocratic judgment by the AFT. To the contrary, the judgment of the WTU's Executive Board is deserving of deference by this Court. Fisher v. Washington Teachers' Union, 350 F.Supp.2d 69, 76-77 (D.D.C. 2004) (Kollar-Kotelly, J.) (recognizing equal right of all members to vote and be candidates for office is guaranteed under LMRDA Title I). Because the WTU has not violated the AFT's Constitution -- indeed, there were no charges prior to the AFT's takeover of the WTU's election that the WTU had violated any specific provision of the AFT's Constitution – the AFT's trusteeships cannot stand.

  2. The AFT stresses that the WTU is a "subordinate affiliate" of its "parent body" the AFT, and is obliged to obey the AFT. (AFT Opp. at 3-4.) At the outset, we note that the patronizing words "subordinate" and "parent" are not used in the administratorship provisions of the AFT Constitution. The WTU is an autonomous local affiliated with the AFT. That said, the AFT greatly overstates the conditions under which the WTU must obey the AFT. The WTU is obliged to obey lawful directives which comply with the LMRDA and the AFT's Constitution. But here, the AFT has not demonstrated that the WTU has violated any specific provision of the AFT Constitution. The AFT's citation to charter revocations is irrelevant because the AFT has never proposed revoking the WTU's charter. And although the WTU's Constitution must contain nothing which conflicts with that of the AFT, it is undisputed that there is no conflict. This is self-evident, we submit, because the revised WTU Constitution was drafted under the administratorship of the AFT's George Springer who made its ratification a condition of restoring the WTU's autonomy. (Second Declaration of George Parker ("Parker 2d Dec.") at ¶ 9.)

3. It is, of course, true that the WTU's Constitution sets out "clear deadlines" for its elections. (AFT Opp. at 5.) But as the AFT's August 4, 2010, Decision and Order seizing control of the WTU's election recognizes:

> The need to conduct the elections for the members on the Elections Committee in 2010 threw off the anticipated schedule for elections set forth in Article VII, Section 2 of the [WTU] Bylaws. That section provides that "Forty five (45) days prior to the date of the election, the Elections Committee shall notify all members of the opening of nominations for office." Reading the rest of Section 2 of the WTU Bylaws, it is clear that the anticipated date for sending out the notice of nominations is April 1st. However, in these circumstances, it was not possible to send out the notice of nominations on April 1st because there was not a duly constituted Elections Committee until May 27, 2010.
>
> The question in this situation, where it is clearly not possible to follow the precise timeline set forth in the Bylaws for conducting internal elections, is what the timeline should be.

(Parker Dec. at ¶ 16, Ex. 5 at 2-3.)

We have already shown that no WTU officer was guilty or even accused by the AFT of manipulating the installation of an Elections Committee and, indeed, that WTU President Parker and the Executive Board did all it could to conduct a timely election. The rhetoric accusing the WTU officers of nefarious plots entered this dispute only after the WTU invoked its legal right to fight for its autonomy. The AFT Decision and Order contains no hint of fault on the part of WTU officials in the seating of the Elections Committee which "threw off" the constitutional timelines. The AFT readily acknowledges that the "question" became "what should the timelines be." Although the Elections Committee could not be installed until May 27 and although it is their duty to then notify the membership of the opening of nominations for office, the Elections Committee wanted to adhere to the specific already-past timelines in the WTU Constitution. The Elections Committee was of the opinion that it could and should declare eligible for office only the candidates who had submitted petitions by April 30th, and conduct an immediate election, albeit in

the middle of the summer when school is obviously not in session.  The AFT Decision and Order recognized the concerns of the WTU Executive Board with this type of schedule, including the need for a stable membership list for a valid election.  (Parker Dec. at ¶ 16, Ex. 5 at 4.)  The AFT concluded, however, that the WTU Executive Board's schedule setting the election more realistically between September 30th and November 30th resulted in an election that "should not be delayed this long."  (Parker Dec. at .)  As we have shown, however, the AFT's solution to the problem – running an election earlier in the fall using an obsolete June 30th eligibility list containing individuals who are no longer union members with no stake in the outcome of the election and excluding new members with a vital stake in the outcome – is both utterly undemocratic[1] and contrary to the past practices of both the WTU and the Department of Labor.[2]

4. The AFT argues that its Decision and Order of August 4, 2010, is not a trusteeship governed by the LMRDA.  (AFT Opp. at 4, 11.)  The LMRDA expressly defines a trusteeship as "any receivership, trusteeship, or other method of supervision or control whereby a labor organization suspends the autonomy otherwise available to a subordinate body under its constitution or bylaws." 29 U.S.C. § 402(h).  Because the WTU's Constitution provides for it to conduct the election of its own officers and because the AFT seized control of the WTU's election

---

[1] The AFT Decision and Order seeks to justify its backward-looking voter eligibility determination by claiming to restore the rights of members (properly speaking, former members) who would have voted in a more timely election. (Parker Dec. at ¶ 16, Ex. 5 at 5.) As a useful comparison, the voter eligibility rule of the National Labor Relations Board for rerun representation elections because the initial election was invalid is similar to the WTU's past practice and approach here. The NLRB does not look backwards to the voter eligibility list from the prior election, even though those voters were deprived of their vote through conduct of the employer or the union. "Where the Board sets aside a prior election and directs a repeat election, the eligibility period, in the absence of unusual circumstances, is the one immediately preceding the date of the repeat election and not the one established for the first election.: *Wagner Electric Corp.*, 127 NLRB 1082 (1960); and *Great Atlantic & Pacific Tea Co.*, 121 NLRB 38 (1958)." NLRB, AN OUTLINE OF LAW AND PROCEDURE IN REPRESENTATION CASES at 23-230, http://www.nlrb.gov/nlrb/legal/manuals/RCase_Outline/law23.pdf

[2] Although DOL found fault in the 2004-2005 election conducted under the AFT administratorship (including too many ineligible voters voting and too many eligible voters excluded from the mail balloting), DOL agreed that the officers ultimately elected through that election should continue in office until the next DOL-supervised election was conducted in 2007.

4

process in its Decision and Order, (Parker Dec. at ¶ 16, Ex. 5 at 8 ("AFT will take charge of 2010 internal election for the WTU")), the AFT has plainly imposed a trusteeship on the WTU.  *See* Kinney v. International Broth. of Elec. Workers, 669 F.2d 1222, 1228 (9th Cir. 1981) ("Suspension of autonomy, although partial, may, nonetheless, constitute the imposition of a trusteeship.")  Nothing can be more fundamental to autonomy than self-determination through democratically-conducted elections.  The operative act taking that autonomy away from the WTU was the AFT's August 4th Decision and Order; accordingly, the AFT's Decision and Order constitutes a trusteeship, and its unlawfulness taints the validity of all subsequent actions the AFT has taken to enforce the Decision and Order, namely the emergency administratorship that the AFT imposed also without a proper hearing.

5.  The AFT claims to find "alarming" the misconstrued argument that the WTU cannot "both represent its members and conduct a timely election for officers…." (AFT Op. at 6.)  There is no need for this feigned alarm.  The reason for the WTU Executive Board's election schedule is the need for an accurate membership list, not to make time to fulfill its representative duties to the membership.  No doubt, however, the distractions caused by an election and the AFT's interference in internal WTU affairs during the initial implementation of the WTU collective bargaining agreement does support the injunction criteria of irreparable harm and the public interest in favor of the WTU.

6.  The AFT's argument about the presumption of validity of trusteeships disregards the law in this Circuit of the necessity of adequate prior notice and a hearing featuring cross-examination for any trusteeship to be valid. (AFT Opp. at 8.)  We note, moreover, that the AFT seems to presume that the AFT Executive Council will automatically ratify the so-called "emergency administratorship" after a belated hearing.  It takes a two-thirds vote of the AFT

5

Executive Council to ratify an emergency administratorship under the AFT Constitution. (Parker Dec. at ¶ 26, Ex. 9 at Article VI, Section 15(b).) The presumption of validity described in 29 U.S.C. § 464 (c) attaches only when a trusteeship has conformed to the union's constitutional procedural requirements **after** it has been "authorized or ratified after a fair hearing." The AFT seems to assume that the AFT Executive Council is a rubber stamp for the officers who authorized the initial administratorship without a "fair hearing." *C.f.* Dynamics Corp. of America v. CTS Corp., 794 F. 2d 250, 257 (7th Cir. 1986) (Posner, J.: "judgment first, trial later, as the Queen of Hearts said in *Alice in Wonderland*.").

      7. The AFT disparages the WTU Executive Board's concern for the voting rights of "a small fraction of possible or future members." (AFT Opp. at 14.) We have shown and the AFT has failed to rebut, however, that these disenfranchised new members number three hundred or more; in the meanwhile, approximately 400 former members will be allowed to vote in an AFT-conducted election. (Parker Dec. at ¶ 36.) The AFT relies heavily on *Marshall v. Local 317, Mailhandlers* for the proposition that using a non-current eligibility list is acceptable. 117 LRRM 2389 (M.D. Ala. 1984) AFT Opp. at 15. In that case, however, the challenge was to DOL's conduct of an election, where an arbitrary and capricious standard applies. But the critical point for purposes of this case is that DOL used a list which was only twelve days old: "Twelve days is not an unreasonable time in which to determine the list of eligible voters." *Id.* at 2390. By contrast, the AFT wants an eligibility cut-off date of June 30th for an election to be conducted and ballots counted over 90 days later on October 4. In 2007, when DOL supervised the last WTU election, ballots were mailed to voters on April 30, 2007, based on a voter eligibility list compiled **two days earlier** on April 28, 2007.[3] (Parker 2d Dec. at ¶ 16 & Ex. C.) DOL itself did not go

---

[3] Parker's declaration has an inadvertent Scribner's Error: it says May 28, 2007 instead of April 28, 2007. Review of Exhibit C show the actual dates were as corrected. A notice of errata will be filed to correct the record.

back to the earlier voting eligibility lists existing at the time when DOL deemed the AFT-conducted election unlawful and sued to invalidate it.

The AFT's invocation of the challenged ballot procedure of the American Arbitration Association is shockingly misleading and wholly immaterial. (AFT Opp. at 16 & Attachment 1.) The procedures the AFT attached without explanation are applicable to a **manual** ballot where voters show up in person and are subject to challenge if their names do not appear on the voter eligibility list (note, for example, the references to "polling place"; instructions to "give the voter a ballot, a challenged envelope, a secret ballot envelope and direct the individual to vote"; and "have the voter place challenged envelope in the ballot box."). The WTU election is an election by **mail** ballot. **New members not appearing on the June 30th eligibility list will never get a ballot.** And although it is theoretically true that candidates may challenge at the mail ballot count voters who are no longer union members eligible to vote, this would be impossible without a valid list not available until months later. Further, there is no chance that, were the AFT "permit[ted] to make those determinations" (AFT Opp. at 16), the AFT would sustain the challenges after it has already ruled that those non-members are eligible to vote.

8. The AFT scores no points by citing the fact that at one time the WTU Executive Board voted to ask the AFT "to supervise and monitor the WTU 2010 general election and contract ratification process." (AFT Opp. at 2, n.1; Second Declaration of Randi Weingarten ("Weingarten 2d Dec.") at ¶ 5, Ex. I.) But as AFT President Weingarten makes clear in her declaration, the AFT limited its involvement in WTU affairs to the election of an Elections Committee and then "we stepped back." (*Id*.) After that, the WTU **adamantly opposed** any further involvement of the AFT in its elections. It is disingenuous for the AFT now to suggest that the WTU should have

expected to be put in trusteeship as a result of a request for assistance that both parties had concluded was at least moot, if not outright rejected and withdrawn.

9. In the AFT's memorandum in support of its motion for a TRO, it contended that the refusal of the WTU to produce nominating petitions "naturally raised concerns as to what has happened to those documents." (AFT TRO Mem. at 7.) Now that the WTU has proved that it did not destroy or tamper with the petitions by providing them to AFT, and has thus removed any pretext for emergency action by the AFT, the AFT is trying to turn the good faith of the WTU around against the WTU as an admission of "just how untenable some of its positions in this matter have been." (AFT Opp. at 2.) The AFT then goes on to excoriate the WTU for its reservation of rights in the transmittal letter with the petitions and the WTU's position that the AFT will be responsible for costs associated with a rerun election based on these petitions, calling it a "threat[]." But valid objections based on candidates' petitions from April 2010 (assuming that they do not submit new petitions) are a certainty in light of the AFT's own ruling that these petitions are invalid because there was no Elections Committee in place until May 27, after the petitions' submission.

The AFT's attempt to advance its cause by mentioning that WTU President Parker himself sent out a call for nominations on March 24, 2010, also fails. (AFT Opp. at 3.) This was yet another part of the WTU's good faith efforts to conduct a timely election in accordance with the constitutional schedule – efforts which negate the AFT's accusation of WTU officers' shenanigans "as a means of perpetuating themselves in office." (AFT Opp. at 17.)

10. AFT digs deep to spin its case by claiming that the WTU's actions with respect to General Vice President Saunders "**appear** to be acts of political retaliation." (AFT Opp. at 12.) (emphasis added). In this situation, appearances, if they even exist, are entirely deceiving. First,

the allegation bears no significance to the AFT's supposed purpose of seeking a TRO in support of its conducting the WTU's election. Second, the issue before the AFT investigating committee bearing on Saunders' situation was purportedly to determine whether the actions of the WTU Executive Board impaired Saunders' ability to run for office. (Parker Dec. at Ex. 2. They did not. It is, rather, another hyperbolic but transparent attempt to discredit the WTU's officers. Nowhere in AFT's own Decision and Order is there a finding that any allegation of retaliation is true. In fact, AFT affirmed, it is entirely false. The WTU Executive Board, which AFT acknowledges has the authority to set the salary of the General Vice President, (Parker Dec. at ¶ 3 Ex. 1 at Article V, Section 2(d)(4) ("The Executive Board shall determine the compensation of the President and the General Vice-President.")), reduced Saunders $131,000 per year base salary to $0 because he refused to account to the Executive Board for his alleged work on behalf of DCPS teachers and to accept assignments from the President and the Executive Board. (Parker Dec. at ¶ 3, Ex. 1 at Article VIII, Section 2(a)) (Stating that the General Vice President "shall perform other duties as delegated by the President or assigned by the Executive Board."). A dissenting member of the three-person AFT investigating panel found that the Executive Board's action was "well within the zone of autonomy and [that] the Executive Board had full authority, under the local Constitution and Bylaws, to take the action that it did at the March 22nd and June 15th meetings." (Parker Dec. at ¶ 16 Ex. 5 at 7.)

It should be borne in mind, moreover, that the WTU Executive Board took this action of addressing Saunders' salary and leave of absence, not WTU President Parker. The background is explained in the annexed declaration and exhibits of WTU Executive Board member Maria Angala which were also submitted to the AFT investigating panel. (Declaration of Brenda Zwack ("Zwack Dec.") at ¶ 1, Ex. 1.) As the AFT Decision and Report notes, the WTU Executive Board

9

"had a bona fide concern…that a paid officer should provide documentation showing time and service to the WTU members." (Parker Dec. at ¶ 16, Ex. 5 at 7.) Indeed, even after the AFT investigating panel gave Saunders the opportunity to document his activities, he failed to provide them with complete reports. (*Id.* at 6.) In taking these actions, Executive Board was merely fulfilling its fiduciary duties to assure that $131,000 annually of members' dues money was being expended in the service of the membership. All Saunders has to do to have his salary restored and leave request approved is to comply with the Executive Board's resolution.

The AFT goes on to voice concern over a notice by DCPS to Saunders "terminating him as of September 3, 2010." (AFT Opp. at 12.) Besides being hearsay, the facts recited in paragraph 2 of the second Squire declaration are false. A DCPS official informed Saunders that "if you do not advise me of your desire to return to your former or comparable position by Friday, September 3, 2010, DCPS will separate you for service effective at the close of business on that date." Zwack Dec. Ex. 2. Saunders' employment fate is in his own hands. It can be no punishment for a teachers' union official to be a teacher. The only reason Saunders might feel otherwise is if he intended unlawfully to engage in campaigning while ostensibly on WTU paid time.

11. The AFT' heavy reliance on the district court's decision in 1994 concerning a rerun election ordered by the AFT is misplaced. (AFT Opp. at 4.) As that order affirms, the AFT constitutional provision concerning the review of elections (Article VI, Section 14(b)) is a typical **post-election** process to be exhausted prior to taking election challenges to the DOL. Even in the face of what, apparently, were numerous uncontested election irregularities that occurred during the 1993 election of a much earlier WTU administration, AFT did not prospectively take over the election process but merely ordered that it be rerun after the irregularities had occurred and been investigated. We note that AFT has offered no evidence of ever having used Article VI, Section

14(b) to trustee a local and its elections prior to those elections being held. Here, however, AFT tries to find cover under its post-election review process without evidence that its sole concern about the timing to the election is of any consequence to the outcome of the election, and in order to impose on the WTU an unprecedented remedy. It is a situation both distinguishable from and contrary to the 1994 election litigation.

For these reasons and those appearing in the record as a whole, the Court should issue a TRO ordering the AFT, its officers, agents and attorneys and those in active concert and participation with it to cease and desist from interfering with the election directed by the WTU Executive Board and deny the AFT's motion for a TRO.[4]

Dated: August 30, 2010    Respectfully submitted,

O'DONNELL, SCHWARTZ & ANDERSON, P.C.

By:   /s/ Anton G. Hajjar
    Anton G. Hajjar
      ahajjar@odsalaw.com
    Melinda K. Holmes
      mholmes@odsalaw.com
    Brenda C. Zwack
      bzwack@odsalaw.com

1300 L Street N.W., Suite 1200
Washington, DC 20005-4178
(202) 898-1707/ FAX (202) 682-9276

---

[4] Although the AFT has referred to its pleadings as supporting its motion for a preliminary injunction, the WTU understands that the upcoming hearing will address only the cross-motions for TROs.