WASHINGTON TEACHERS' UNION,
LOCAL #6, AMERICAN FEDERATION
OF TEACHERS, AFL-CIO,

    Plaintiff/Counter-Defendant,

    v.

AMERICAN FEDERATION OF
TEACHERS, AFL-CIO,

    Defendant/Counter-Plaintiff.

Civil Action No. 10-1387 (CKK)

## MEMORANDUM OPINION
(September 1, 2010)

This case involves a dispute between the Washington Teachers' Union, Local #6,

American Federation of Teachers, AFL-CIO (the "WTU") and its parent union, the American

Federation of Teachers, AFL-CIO (the "AFT") relating to the WTU's failure to conduct a timely

election for its officers prior to July 1, 2010.  The WTU's Executive Board has established a

schedule for proceeding with an election that concludes on November 30, 2010, but the AFT

conducted an investigation and, on August 4, 2010, issued a Decision and Order declaring that it

would take over the WTU's election and complete it by October 4, 2010.  The WTU refused to

comply with the Decision and Order, contending that the AFT lacked authority to intervene in the

WTU's conduct of its own elections.  On August 17, 2010, the AFT imposed an emergency

administratorship on the WTU for the purpose of taking control of WTU's election; the AFT has

scheduled a hearing on that administratorship for September 10, 2010.

The WTU filed this action on August 18, 2010, claiming that the AFT's assumption of

control over the WTU's elections constitutes a breach of its contract with the WTU and violates the provisions of the Labor-Management Report and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 401-531. The WTU prays for a judgment declaring the AFT's actions to be invalid and for an injunction prohibiting the AFT from enforcing its Decision and Order and interfering with the WTU's election of officers. The AFT filed a Counterclaim for declaratory and injunctive relief to enforce its Decision and Order and its administratorship of the WTU.

On August 20, 2010, the AFT filed a [5] Motion for a Temporary Restraining Order and Preliminary Injunction. The AFT seeks a temporary restraining order ("TRO") against the WTU requiring it (1) to turn over to the AFT all nominating petitions and voter eligibility and membership lists; (2) to cease obstructing the AFT's efforts to obtain access to teacher bulletin boards throughout the District of Columbia Public Schools; and (3) to cease using WTU resources to misinform its membership regarding the election and to resist the AFT's orders. The AFT also seeks a preliminary injunction enjoining the WTU from refusing to abide by the Decision and Order and the administratorship imposed by the AFT on an emergency basis. The same day, the WTU filed its own [6] Motion for a Preliminary Injunction and for Setting of a Hearing. In that motion, the WTU seeks a preliminary injunction prohibiting the AFT from interfering with its election for officers. On August 23,[1] the WTU filed a [9] Cross Motion for a Temporary Restraining Order. In that motion, the WTU seeks a TRO restraining the AFT from persisting in its plans to conduct an election for officers, attempting to contact WTU members regarding the election, publicly commenting on the election, interfering with the WTU's internal affairs, and imposing an administratorship.

---

[1] Unless otherwise stated in this Memorandum Opinion, all dates refer to the year 2010.

The Court issued a minute order on August 23 setting forth a briefing schedule on the parties' motions for TROs and preliminary injunctions. Pursuant to that schedule, the parties filed briefs in opposition on August 27 and reply briefs on August 30. The Court held a hearing on the pending motions on Tuesday, August 31, 2010 (the "TRO hearing"). Based on the parties' written motions, the pleadings, the representations made by the parties' counsel on the record during the hearing, which is incorporated as part of the record for this Memorandum Opinion, and the applicable authorities, the Court shall DENY the AFT's motion for a TRO and preliminary injunction and GRANT-IN-PART and DENY-IN-PART the WTU's motions for a TRO and preliminary injunction. The Court shall preliminarily enjoin the AFT from enforcing its Decision and Order and emergency administratorship of the WTU pending the outcome of the hearing on September 10, 2010. In all other respects, the Court shall deny the parties' requests for emergency and preliminary relief.

## I. BACKGROUND[2]

The AFT is a national union representing approximately 1.5 million members nationally, primarily educators who work in the public and private sectors. Decl. of Randi Weingarten ("Weingarten Decl.") ¶ 2. The WTU is a subordinate body of the AFT and an autonomous labor organization representing teachers employed by the District of Columbia Public Schools ("DCPS"). Compl. ¶ 3. The AFT is governed by its Constitution and Bylaws, most recently updated in July 2010. Weingarten Decl. ¶ 3 & Ex. A ("2010 AFT Constitution and Bylaws"). The WTU is governed by a Constitution and By-Laws adopted on March 16, 1981, and revised

---

[2] In this section the Court sets out only the facts in the record that are pertinent to the Court's ruling on the pending motions for preliminary relief. The parties have set forth a number of other facts that may be relevant to an ultimate determination on the merits.

October 21, 2004. Decl. of George Parker ("Parker Decl.") ¶ 3 & Ex. 1 (WTU Constitution and By-Laws).

A.    *The WTU's 2010 Elections Schedule*

The WTU is governed by officers and representatives who are elected by the membership every three years. Parker Decl. ¶ 3. Pursuant to the WTU Constitution and By-Laws ("WTU Constitution"), only members in good standing who are actively employed by DCPS are eligible to vote in union elections. *Id.* ¶ 13; WTU Constitution, art. VII, § 2(B). The WTU Constitution establishes an Elections Committee, to be made up of fifteen members, that is responsible for conducting all general and special elections of the WTU. WTU Constitution, art. VII, § 1(E). Forty-five (45) days prior to the date of the election, the Elections Committee must notify all members of the opening of nominations for office. *Id.* § 2(A). All nominating petitions must be returned to the WTU's office before the close of the last regular working day in April. *Id.* § 2(C). The Elections Committee must certify that all nominating petitions have been properly signed by twenty members in good standing before placing names on the ballot. *Id.* § 2(D). Ballots are to be mailed to members no later than fifteen (15) days following the close of nominations. *Id.* § 2(I). The election is conducted by an outside agency, which is recommended by the Elections Committee to the WTU Executive Board. *Id.* § 2(H). Officers serve three years, until their successors are elected and installed, which shall occur at a meeting in May. *Id.* § 2(J). Newly installed officers assume their respective offices on July 1. *Id.* § 2(L).

On March 24, 2010, WTU President George Parker sent a letter to WTU members announcing that the union's election for officers was set to take place in May 2010 and that election petitions were available and must be returned no later than April 30, 2010. *See* Second

4

Decl. of Albert Squire ("Second Squire Decl."), Ex. H (3/24/10 Letter).  During a March 25

meeting, the WTU Executive Board directed the WTU President to engage the AFT's services to

supervise the 2010 general election.  *See* Second Decl. of Randi Weingarten ("Second

Weingarten Decl."), Ex. I (3/25/10 WTU Executive Board Meeting Minutes).  On April 9, the

WTU contacted the AFT and sought assistance in running an election for its Elections

Committee, which did not have enough members to conduct the election within the timetable

established by the WTU Constitution.  Weingarten Decl. ¶ 6.  The AFT complied with the

WTU's request, and the AFT itself then conducted an election of Elections Committee members,

managed by the American Arbitration Association.  *Id.*  The results of the Elections Committee

election were certified on May 27.  On June 4, AFT President Randi Weingarten sent an e-mail

to declared WTU presidential candidates George Parker, Nathan Saunders, Elizabeth Davis, and

Elections Committee Chair Claudette Carson stating in part:

> AFT's limited role in monitoring and assisting with the election of the Election
> Committee ended with the certification of the results by AAA.  The duly-elected
> Election Committee now has responsibility for conducting the election of officers as
> described in the WTU constitution and bylaws.  Therefore, it is neither necessary nor
> appropriate to include me and other AFT staff in each communication about the
> local's internal election process.

Parker Decl. ¶ 24 & Ex. 8 (6/4/10 E-mail).  AFT General Counsel David Strom later informed

George Parker and Nathan Saunders that "AFT does not become involved in local internal

election issues until it is clear that the parties have exhausted their avenues for redress at the local

level."  *Id.* ¶ 23 & Ex. 7 (6/14/10 E-mail).

Following the certification of the WTU Elections Committee on May 27, there was a

dispute within the WTU about whether the Executive Board or the Elections Committee should

set the new dates for the election, since the dates provided for in the WTU Constitution had already passed. Parker Decl. ¶ 21. The WTU sought advice from its legal counsel, who rendered an opinion on June 9 that it was the Executive Board, not the Elections Committee, that was empowered to set new deadlines for nominations and elections of WTU officers. *See* Parker Decl., Ex. 2 (6/9/10 Letter from Lee W. Jackson to George Parker). At a meeting held on June 9, the WTU Executive Board passed a resolution setting the WTU's internal election of officers for the fall of 2010. Compl. ¶ 6. The Executive Board's resolution stated in pertinent part:

> 1. That the notice of nominations for election of officers, Executive Board Members, Delegates to the Washington Metropolitan Council and Delegates to the Maryland States and DC AFL-CIO be sent to all WTU members by the WTU Elections committee no later than September 30, 2010 with election balloting to end at 5 pm, November 30, 2010.
>
> 2. That the Executive Board with the assistance of legal counsel and the WTU parliamentarian establish other constitutionally mandated timelines and provide to WTU members at the time of the notice of nominations.
>
> 3. That all candidates for elected positions submit new petitions to be certified by the newly duly constitutionally elected Elections Committee.
>
> 4. That the WTU Executive Board maintains all petitions submitted on April 30, 2010 for organizational records and for legal purposes.

*Id.* ¶ 7. The Executive Board established the following election schedule:

> 1) Notice of the opening of nominations for the election of WTU officers, WTU Delegates to the Metropolitan Washington Council AFL-CIO and Delegates to the Maryland State/DC AFL-CIO will be sent to all members by the WTU Elections Committee: September 30, 2010.
>
> 2) Deadline for submission of petitions: October 29, 2010
>
> 3) Balloting and election of WTU Officers: November 15 - 30, 2010
>
> 4) Counting of ballots - November 30, 2010

*Id.* ¶ 8.

On June 23, AFT President Weingarten sent a letter to WTU President Parker and the members of the WTU Executive Board expressing concern that the election process for officers had not commenced. *See* Weingarten Decl., Ex. C (6/23/10 Letter from Randi Weingarten to WTU Executive Board). In her letter, President Weingarten noted that she had been informed that the Elections Committee had been unable to obtain the documents and staff support necessary to hold an election. *Id.* President Weingarten wrote that "there is no reason why three weeks after the Committee has been seated, the nominations and elections process has not been commenced." *Id.* On June 25, 2010, Parker replied to Weingarten, informing her of the Executive Board's action establishing a new elections schedule. *See* Parker Decl., Ex. 6 (6/25/10 Letter from George Parker to Randi Weingarten).[3] Parker's letter explained that in light of the new elections schedule adopted by the Executive Board, the Board did not support the Elections Committee's request for the nominating petitions submitted on April 30 and the WTU membership list. *Id.*

President Parker sent a letter on July 1 to the WTU members announcing the new election schedule. *See id.*, Ex. 2 (7/1/10 Letter from George Parker to WTU Members).

B.    *The AFT Investigates the WTU's Actions Regarding the Election*

Following the WTU's failure to proceed with an election immediately after the Elections

---

[3] President Parker states in his declaration that the Executive Board "reached a determination regarding the meaning of the WTU Constitution and an election schedule" on June 25. *See* Parker Decl. ¶ 20. However, the other evidence in the record indicates that the Board made this determination on June 9. *See* Compl. ¶¶ 6-8; Parker Decl., Ex. 6 at 1-2; Parker Decl., Ex. 2 at 2 (7/1/10 Letter from George Parker to WTU Members). The precise date of the Board's action is not relevant.

Committee was put in place, the AFT Executive Council voted to initiate an investigation in accordance with its authority to investigate local elections under Article VI, Section 14(b) of the AFT Constitution. Weingarten Decl. ¶ 9. Section 14(b) reads as follows:

> The executive council may, by a two-thirds vote, authorize the president to appoint a committee to investigate a local or state federation where an election appears to have been conducted in violation of the local or state federation constitution, the AFT constitution or applicable federal law or a local whose conduct is not in harmony with the principles of the AFT and tends to bring the AFT into disrepute or a local that fails to maintain affiliation mandated in Article XI, Sections 2 and 3. The local or state federation shall be given an opportunity to present its position to the committee. The committee shall submit its findings and recommendations to the council, which shall have the power to take action to resolve the matter, including the imposition of the penalty contained in Article XI, Section 3, of this constitution and/or other appropriate penalties. The action of the council in such cases shall be final. The cost of such an investigation shall be borne by the national office.

Weingarten Decl., Ex. A ("2010 AFT Constitution and Bylaws"), art. VI, § 14(b). On July 9, President Weingarten sent a letter to George Parker, Nathan Saunders, Elizabeth Davis, and Claudette Carson informing them of the AFT's investigation. Weingarten Decl., Ex. D (7/9/10 Letter). In the letter, Weingarten wrote, "It is manifestly apparent that under the current circumstances of internal struggle that [sic] a timely and proper election for the officers of the WTU is not possible. Therefore, it is necessary and required that the national union step in to ensure an open, transparent and fair election for the WTU members." *Id.* at 2. The AFT Executive Council appointed three AFT Vice-Presidents to conduct the investigation. Weingarten Decl. ¶ 9.

On July 14, AFT General Counsel David Strom sent a Notice of Hearing letter to Parker, Saunders, Davis, and Carson on behalf of the AFT investigatory committee informing them that the committee would conduct a fact-finding hearing on July 21. *See* Parker Decl., Ex. 11 (Notice

of Hearing). The Notice of Hearing indicated that the committee would investigate, *inter alia*, the following issues:

> 1) When should the internal elections for officers and members of the Executive Board of the WTU take place in light of the fact that the precise dates set out in the WTU Constitution and Bylaws for the election could not be met because there was not a duly constituted Elections Committee in place to start the process in the spring of 2010?

> 2) Whether the April 30th deadline for submitting nominations petitions set forth in the WTU Constitution and Bylaws should be followed in light of the fact that there was no duly constituted Elections Committee at that time and the Committee had not sent out the Notice of Nominations to the membership?

> 3) What is the universe of WTU members who should be eligible to participate in the internal WTU election and should that universe include individuals who were excessed[4] on June 30, 2010?

*Id.* at 2. The Notice of Hearing stated that "[t]his is a fact-finding and <u>not</u> an adversarial proceeding." *Id.* (emphasis original). It also indicated that witnesses would be asked to take a simple oath and would be free to have legal counsel present, but the role of such counsel would be limited and questions to the witnesses would come from the committee. *Id.*

A day-long hearing was held on July 21, in which various WTU officers and staff appeared and presented evidence and testimony. Weingarten Decl. ¶ 10. The WTU filed an Opening Statement with the committee which summarized the WTU's position and its objection to the hearing. Parker Decl. ¶ 30 & Ex. 12 (Opening Statement of WTU).

On August 3, AFT President Weingarten sent a letter to WTU members informing them

---

[4] "Excessed" teachers are those who are displaced from their assigned schools and are seeking placement in other locations. Parker Decl. ¶ 33. Under the WTU's new collective bargaining agreement, excessed teachers with an "effective" job performance remain on the rolls for at least one school year, and excessed teachers with a "minimally effective" rating could be terminated if they fail to find a placement by August 22, 2010. *Id.* Teachers excessed under the prior contract have a right to placement that does not expire. *Id.*

that the investigation committee had made the following conclusions, which are pertinent at this time: (1) the election process should start immediately, beginning with the prompt mailing of notice of nominations for all open positions to members; and (2) the April 30 petition deadline is no longer operative, and therefore any candidate may submit nominating petitions for any open office.  Parker Decl., Ex. 13 (8/3/10 Letter).  Enclosed with the letter were a list of WTU positions open for election, a nominating petition, and a Nominations and Elections Notice.  *Id.* The letter told WTU members that the deadlines and dates set forth in George Parker's July letter to members no longer applied.  *Id.*

       C.      *The AFT's Decision and Order*

On August 4, 2010, the AFT Executive Council issued its Washington Teachers Union Investigation Decision and Order ("Decision and Order").  *See* Weingarten Decl., Ex. E (Decision and Order).  The Decision and Order discussed the investigation committee's findings and set forth the Executive Council's decisions with respect to the issues investigated.

With respect to the election schedule, the AFT Executive Council concluded that the WTU Executive Board's decision to schedule elections in the fall of 2010 was "not compatible with the directives in the WTU Constitution that officers be elected and seated by July 1st." Decision and Order at 4.  The Council found that "[w]hile . . . it is true that the necessity to conduct an election for members of the Election Committee in May 2010 threw off the normal election schedule, the counting of ballots on November 30, 2010 is too significant a deviation from the intent of the local Constitution."  *Id.*  The Council acknowledged that there may be practical reasons to wait until fall to conduct the election, such as obtaining a more accurate list of eligible voters, but that those practical reasons did not justify such a long delay.  *Id.*  The

Council found that the list of eligible voters should be those WTU voters who were eligible on the last payroll period in June 2010. *Id.*

With respect to the submission of nominating petitions, the Executive Council concluded that the nominations deadline of April 30 was inapplicable because there was no valid Elections Committee at that time and no valid notice of nominations. *Id.* at 4-5. The Council therefore concluded that there should be new notices sent to the members with an opportunity to resubmit nominating petitions. *Id.* However, the nominations previously submitted by April 30 would be reviewed and, if compliant with the WTU Constitution, accepted for the election. *Id.*

With respect to the universe of eligible voters, the Decision and Order holds that it would be unfair to disenfranchise certain voters who would have been eligible had the election been timely conducted but who are no longer eligible. *Id.* at 5. The Council also concluded that it was not reasonable to wait until the 2010-11 school year to begin to obtain new membership lists. Therefore, the Decision and Order states that the universe of eligible voters will be those on the rolls during the last payroll period of June 2010.

In the "Order" section of the Decision and Order, the AFT Executive Council stated, in pertinent part:

> 1. *AFT will take charge of the 2010 internal election for the WTU.* This election will include the Officers, Executive Board Members, Trustees, Delegates to the Metropolitan Labor Council and Delegates to the Maryland State and D.C. AFL-CIO.
>
> 2. a) The election process will begin with a notice of nominations to the WTU membership informing the members of the open positions for office, the term of office, the method to submit a completed nominations form, a copy of a nominations form and the time and location for submitting such nominations.
>
> b) The deadline for submitting nominations petitions will be that set forth in the WTU Bylaws–e.g., 30 days from the issuance of the notice. The notice will be sent

out within 3 working days from the time this decision is issued.

3.  Those nominations petitions that have already been submitted will be accepted and they will be reviewed for sufficiency with any new petitions.

4.  The eligibility cut-off date for WTU members to participate in the election will be the last payroll period in June 2010.

5.  Fifteen days after the close of nominations, ballots will be sent by U.S. Mail to the WTU membership.  The voting period will be fifteen (15) calendar days.  The American Arbitration Association will be retained to conduct the balloting and to certify the election results consistent with the provisions of the WTU Constitution and Bylaws.

Decision and Order at 8-9 (emphasis added).

Following the issuance of the Decision and Order, AFT Secretary-Treasurer Antonia Cortese appointed Albert Squire, Regional Director of AFT's Southern Region, to be the person within AFT responsible for ensuring that the WTU's election was conducted in accordance with the Decision and Order.  Decl. of Albert Squire ("Squire Decl.") ¶ 5.  Squire immediately began the elections process by sending a "Nominations and Election Notice" and nominating petitions to each member of the WTU by electronic mail and U.S. mail.  *Id.* ¶ 6.  The AFT mailed the notice and petitions to each WTU member based on AFT's records, which were current as of April 29, 2010.  *Id.*  The nominating petitions submitted on April 30 were in the possession of the WTU under the control of President Parker.  *Id.* ¶ 7.  On August 5, Squire sent a letter to Parker requesting that he turn over the nominating petitions so that he could review them.  *Id.* ¶ 8.  Parker did not respond to this letter, and Squire was unable to reach him in subsequent attempts by telephone and e-mail.  *Id.* ¶¶ 9-11.  As of August 19, WTU had not provided AFT with either the April 30 nominating petitions or the June 30 membership list.  *Id.* ¶ 11.  According to Devonae Tinsley, the WTU's Director of Membership, the WTU maintains its

membership list on a database that is hosted on the AFT's computer server. Decl. of Devonae Tinsley ("Tinsley Decl.") ¶ 2. AFT personnel have access to this database. *Id.* According to Ms. Tinsley, the AFT has access to the data from which it could create a membership list which was current as of June 30, 2010. *Id.* ¶ 4.

On August 13, the WTU Executive Board sent a letter to the AFT Executive Council asking that it reconsider the Decision and Order. *See* Parker Decl. ¶ 37 & Ex. 14 (8/13/10 Letter). On August 16, the AFT denied the request for reconsideration without explanation. *Id.* ¶ 38 & Ex. 15 (8/16/10 Letter from Randi Weingarten to George Parker). In a letter written to George Parker and copied to the WTU Executive Board, AFT President Weingarten stated that

> Unless by noon on Tuesday, August 17, 2010, we receive an unequivocal sworn undertaking from you and the Executive Board . . . to comply in all respects with and to fully cooperate in all good faith the processes previously articulated [under the Decision and Order], an Administratorship shall . . . be established and an Administrator appointed . . . to restore the rights of members in election procedures or representation, to secure and safeguard the vital records and assets of the WTU from immediate threat, and to take such actions as are necessary to protect the interests of the membership, in accordance with Article VI of the Constitution and Bylaws of the [AFT], particularly Sections 14 and 15 and each of the subsections thereof, and the applicable provisions of law.

*Id.*, Ex. 15. President Parker and the WTU Executive Board did not immediately respond to the AFT's statement.

### D.     The AFT Imposes an Emergency Administratorship

On August 17, AFT President Weingarten wrote to WTU President George Parker and informed him that at 11:30 a.m. that day, the AFT Executive Council voted unanimously to place the WTU under a limited emergency administratorship pursuant to Article VI, Section 15(a) and (c) of the AFT Constitution. *See* Parker Decl. ¶ 39 & Ex. 16 (8/17/10 Letter). The letter stated

that "[t]his action is part of our ongoing efforts to ensure that the WTU elections are carried out in a manner consistent with the WTU constitution and the AFT Executive Council Decision and Order dated August 4, 2010." *Id.*, Ex. 16. The letter indicated that Albert Squire would serve as the administrator. *Id.* President Weingarten appointed three AFT Vice-Presidents to conduct an administratorship hearing.

Section 15 of Article VI of the AFT Constitution provides in pertinent part:

**Section 15.** (a) **Grounds.** In exceptional and unusual circumstances where an AFT state or local affiliate is incapable of taking adequate remedial measures on its own initiative, the AFT may establish an administratorship for the purpose of:

(i) restoring the rights of members in situations where there has been a significant failure either in election procedures or representation required under the AFT or affiliate constitution(s); or

(ii) correcting financial malpractice or misappropriation or loss of funds.

**Section 15.** (b) **Process for Approval of an Administratorship.** Where the executive council has reason to believe that the grounds set forth in paragraph (a) above exist to consider an administratorship, the president shall be authorized to appoint a committee of the council to investigate and conduct a hearing. That hearing shall be scheduled within 30 days, at which time the affected parties will be able to appear and present evidence, witnesses and arguments. Notice of such hearing and a written statement of the grounds for the proposed administratorship will be provided to the affected local or state federation before the hearing. The committee shall submit its findings and recommendations to the council for final approval. Thereafter, the executive council, by a two-thirds vote, shall have the power to authorize the president to establish an administratorship and appoint an administrator. In situations where an administratorship has been approved, the members of the affected AFT affiliate will be notified of the reasons for such decision, including an explanation of the administrator's duties and functions.

**Section 15.** (c) **Emergency Administratorship.** Under grounds pursuant to Article VI, Section 15(a), the AFT president, upon the unanimous decision of the AFT president, secretary-treasurer and executive vice president, is authorized to invoke an emergency administratorship in situations requiring immediate action for the purpose of securing and safeguarding an affiliate's assets and vital records from immediate threat, provided that the executive council by a two-thirds vote approves

such emergency action within five business days of its having been invoked. Within 24 hours thereafter, the president shall appoint a committee of the council, in keeping with Article VI, Section 15(b) of the AFT constitution, to investigate and conduct a hearing; and the normal processes, timetables, hearing rights and approval requirements under Article VI, Section 15(b) of this constitution shall apply.

Weingarten Decl., Ex. A, art. VI, § 15.

On August 26, 2010, President Weingarten issued a Notice of Hearing and Grounds for Establishing an Administratorship to WTU President Parker and the members of the WTU Executive Board. Second Weingarten Decl., Ex. J (8/26/10 Notice). In that Notice, President Weingarten explained that the grounds for the administratorship are, *inter alia*, as follows:

1. The actions by the WTU Officers and Executive Board in refusing to comply with the AFT Executive Council's August 4th Decision and Order[.]

2. The actions by the WTU Officers and Executive Board in obstructing the implementation of the Executive Council's Decision and Order.

3. The actions by the WTU Officers and Executive Board in failing to follow the provisions of both its Constitution and Bylaws and the AFT Constitution and Bylaws regarding the frequency of elections for officers and members of the Board.

4. The WTU Officers and Executive Board's violation of the local's Constitution and Bylaws by holding onto office beyond their elected terms and refusing to conduct internal elections in a timely manner.

5. The WTU Officers and Executive Board's violation of the democratic rights of the WTU membership to vote for and elect leadership on the timetable that is set forth in the local's Constitution and Bylaws.

6. The WTU's failure to provide the AFT Administrator the materials and cooperation that he has requested to carry out the election is a violation of the AFT and WTU Constitutions.

*Id.* at 2. The Notice announced that a hearing would be held on September 10, 2010, in which WTU would have full opportunity to respond to these charges. *Id.*

On August 26, 2010, the WTU provided the April 30 nominating petitions to Albert

15

Squire.  Second Squire Decl. ¶ 3.

## II.  LEGAL STANDARD

The parties have filed cross-motions for a temporary restraining order and preliminary injunction.  "The standard for issuance of the 'extraordinary and drastic remedy' of a temporary restraining order or a preliminary injunction is very high, and by now very well established." *RCM Techs., Inc. v. Beacon Hill Staffing Grp., LLC*, 502 F. Supp. 2d 70, 72-73 (D.D.C. 2007) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).  The moving party must show:  (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunctive relief were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *Hall v. Daschle*, 599 F. Supp. 2d 1, 6 n.2 (D.D.C. 2009) ("[t]he same standard applies to both temporary restraining orders and to preliminary injunctions").  The moving party bears the burden of persuasion and must demonstrate, "by a clear showing," that the requested relief is warranted. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  "The four factors have typically been evaluated on a 'sliding scale.'"  *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009).  Under this sliding scale, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor."  *Id.* at 1291-92.

"It is particularly important for the [movant] to demonstrate a substantial likelihood of success on the merits."  *Barton v. District of Columbia,* 131 F. Supp. 2d 236, 242 (D.D.C. 2001) (citing *Benten v. Kessler*, 505 U.S. 1084, 1085 (1992)).  If the movant fails to do so, inquiry into

the remaining factors is unnecessary, for the injunctive relief must be denied on that ground alone. *See Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 614 (D.C. Cir. 1992) (affirming denial of preliminary injunction where the district court properly concluded that the plaintiff had "no likelihood of success on the merits"); *Katz v. Georgetown Univ.*, 246 F.3d 685, 688 (D.C. Cir. 2001) ("although we apply a four-factor test in weighing a request for a preliminary injunction, such relief never will be granted unless a claimant can demonstrate 'a fair ground for litigation'"); *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1507 (D.C. Cir. 1995) ("Given the inadequacy of [plaintiff]'s prospects for success on the merits, there may be no showing of irreparable injury that would entitle him to injunctive relief."), *amended on other grounds on reh'g*, 66 F.3d 1226 (D.C. Cir. 1995). In addition, the movant must establish that irreparable injury must be likely, "not just a possibility." *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 375 (2008).

## III. DISCUSSION

The parties have filed cross motions for temporary restraining orders and preliminary injunctions seeking diametrically opposed forms of relief: the AFT seeks to compel WTU's compliance with its Decision and Order and administratorship, while the WTU seeks to restrain the AFT from enforcing its Decision and Order and administratorship.[5] Thus, the parties are generally in agreement that some form of preliminary relief is appropriate but in disagreement about who is entitled to it. Accordingly, the Court shall focus its analysis primarily on the likelihood of success on the merits before addressing the other three prongs of the analysis.

---

[5] The terms "administratorship" and "trusteeship" used in this context refer to the same thing and may be used interchangeably.

*A.*     *Substantial Likelihood of Success on the Merits*

The WTU's arguments can be summarized as follows: (1) the AFT's investigation into the WTU election is not authorized by the AFT Constitution and constitutes an invasion of the WTU's right to conduct its own elections; (2) the AFT's Decision and Order and the subsequent efforts to enforce it constitute a de facto trusteeship imposed without due process under the Labor-Management Report and Disclosure Act; and (3) the emergency administratorship imposed by the AFT is invalid for failure to conduct a prior hearing. In response, the AFT argues that (1) the AFT Constitution provides it with authority to investigate and supervise the conduct of subordinate union elections; (2) the Decision and Order did not constitute a trusteeship for purposes of the LMRDA; and (3) the emergency administratorship is valid under the LMRDA and the terms of the AFT Constitution. The parties have also raised a series of collateral issues, such as whether AFT's plan to use the June 30 membership list for the election violates the LMRDA. The Court shall address each of the arguments below. Because the validity of the emergency administratorship is potentially dispositive of the other issues, the Court shall address that issue first before turning to the validity of the Decision and Order.

1.     Trusteeships Under the LMRDA

The LMRDA defines a trusteeship as "any receivership, trusteeship, or other method of supervision or control whereby a labor organization suspends the autonomy otherwise available to a subordinate body under its constitution or bylaws." 29 U.S.C. § 402(h). Section 302 of the LMRDA, 29 U.S.C. § 462, provides as follows:

> Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the

purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization.

Accordingly, a labor organization may only impose a trusteeship for one of the purposes enumerated in § 302, and it must do so in accordance with its constitution and bylaws. The LMRDA provides a cause of action for a local union to challenge a trusteeship that has been imposed on it by a parent union. *See* 29 U.S.C. § 464(a). Section 304(c) of the LMRDA, 29 U.S.C. § 464(c), affords a presumption of validity to trusteeships that are imposed in accordance with certain procedural requirements:

> In any proceeding pursuant to this section a trusteeship established by a labor organization in conformity with the procedural requirements of its constitution and bylaws and authorized or ratified after a fair hearing either before the executive board or before such other body as may be provided in accordance with its constitution or bylaws shall be presumed valid for a period of eighteen months from the date of its establishment and shall not be subject to attack during such period except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 462 of this title.

Although the literal terms of § 464(c) do not require that a hearing be held in order to implement a trusteeship, the D.C. Circuit has held that "[t]he legislative history of § 464(c), as well as policy considerations, . . . compel a holding that without a hearing a trusteeship is invalid." *Local Union 13410, United Mine Workers v. United Mine Workers*, 475 F.2d 906, 913 (D.C. Cir. 1973). In *Local Union 13410*, the D.C. Circuit stated the requirements for the timing of the hearing:

> There is no absolute requirement that a hearing be held prior to imposition, since the statute states that a hearing may either "approve or *ratify*" the trusteeship. The possibility of "ratification" implies that under some circumstances a hearing may occur after a trusteeship is imposed. We can imagine extreme emergencies that might compel action without prior notice and hearing. Even in such an emergency

situation, however, a hearing date could be set when the trusteeship was imposed and held shortly thereafter. . . . For future guidance to unions attempting to abide by the law and courts reviewing union activity, our holding on this point may be summarized as follows. Absent a reasonable belief in the necessity for immediate action, all practical steps must be taken to afford a hearing *before* a trusteeship is imposed. A trusteeship may be imposed without a hearing only where a parent union could reasonably believe that an emergency situation does not allow time for such a hearing. Even in such emergency situations, at the time the trusteeship is imposed a hearing should be scheduled for the earliest practicable date thereafter. If the parent union does not comply with these requirements, any trusteeship will be treated as void *ab initio*.

475 F.2d at 914-15. Thus, under the LMRDA as interpreted in *Local Union 13410*, a labor organization may establish a trusteeship on an emergency basis without a prior hearing so long as it comports with its constitution and bylaws and there is a reasonable belief in the necessity for immediate action such that a prior hearing could not be held.[6]

2.     The AFT's Emergency Administratorship

The AFT imposed its emergency administratorship of WTU on August 17, 2010, pursuant to the administratorship provisions spelled out in Article VI, Section 15 of the AFT Constitution. As stated in the previous section, Section 15(a) authorizes the AFT to establish an

---

[6] The parties disagree about whether the presumption of validity in 29 U.S.C. § 464(c) attaches to an "emergency trusteeship" prior to the time when a hearing is held. The Second Circuit has held that it does:

> [W]here a parent labor organization's constitution allows imposition of a temporary trusteeship in the case of an emergency, and the proper procedural requirements are met, a federal court may not invalidate the trusteeship, unless the local is able to show by clear and convincing evidence that the trusteeship was not established in good faith or was for a purpose not authorized by the [LMRDA].

*Int'l B'hood of Teamsters v. Local Union No. 810*, 19 F.3d 786, 791 (2d Cir. 1994). The D.C. Circuit does not appear to have weighed in on this question. Because the Court finds that the AFT did not have a reasonable basis for acting on an emergency basis, the Court need not address this question.

administratorship for the purpose of "restoring the rights of members in situations where there has been a significant failure either in election procedures or representation required under the AFT or affiliate constitution(s)."  Weingarten Decl., Ex. A, art. VI, § 15(a).  The Court agrees with the AFT that the purpose of the administratorship—to conduct the WTU's 2010 elections for officers—satisfies the requirements of Section 15(a).  The WTU concedes that it failed to conduct its 2010 officer elections in a timely manner as required by the WTU Constitution, and the result is that the previously elected officers have remained in office several months beyond their official terms.  This is inconsistent with the requirements of the LMRDA.  *See* 29 C.F.R. § 452.24 ("It would not be consistent with these provisions of the Act for officers elected for the maximum terms allowable under the statute to remain in office after the expiration of their terms without a new election.  Failure to hold an election for any office after the statutory period has expired constitutes a continuing violation of the Act . . . .")  Thus, the AFT appears to have appropriate grounds for an administratorship under Section 15(a)(i), and this is consistent with the language in the LMRDA allowing trusteeships for the purpose of "restoring democratic procedures," 29 U.S.C. § 462.

However, in order for the emergency administratorship to be valid, the AFT must have complied with the specific provisions in Article VI, Section 15(c) of the AFT Constitution.  That provision authorizes the AFT "to invoke an emergency administratorship in situations requiring immediate action for the purpose of securing and safeguarding an affiliate's assets and vital records from immediate threat . . . ."[7]  Weingarten Decl., Ex. A, art. VI, § 15(c).  Under the D.C.

---

[7] The WTU does not dispute that the AFT complied with the other procedural requirements of Section 15(c), such as approval by a two-thirds vote of the AFT Executive Council.

Circuit's opinion in *Local Union 13410*, the AFT must have had a reasonable belief that immediate action was necessary in order to secure and safeguard the WTU's assets and/or vital records from immediate threat. Of the seven grounds for the emergency administratorship set out by the AFT on August 26, only one of them directly addresses the issue of vital records (the parties agree that the WTU's assets are not at issue). *See* Second Weingarten Decl., Ex. J at 2 ("6. The WTU's failure to provide the AFT Administrator the materials and cooperation that he has requested to carry out the election is a violation of the AFT and WTU Constitutions.") The AFT explained in its briefs and during the hearing that there were two sets of "vital records" at issue: (1) the nominating petitions that were previously submitted by April 30; and (2) the WTU's membership list as of June 30. The AFT contends that these records are critical to the 2010 election for WTU officers and therefore its emergency administratorship was necessary to secure these records to begin the elections process.

The WTU argues that there is no basis for the emergency administratorship because the AFT had no reasonable basis to believe that immediate action was necessary to "secure and safeguard" either the nominating petitions or the WTU's June 30 membership list from "immediate threat." With respect to the membership list, the WTU has submitted a sworn declaration from its Director of Membership, Devonae Tinsley, who explains that the WTU's membership list is maintained on a database administered by the AFT. *See* Tinsley Decl. ¶ 2. Although Ms. Tinsley is responsible for regularly updating the WTU's membership list on the AFT's database, Ms. Tinsley explains that AFT already has access to all of the data needed to compile a membership list that would be accurate as of June 30, 2010. *Id.* ¶ 4. During the hearing, the AFT's counsel suggested that it would be unusual for the AFT to conduct an election

based on its own records and that it would want the WTU to verify or certify a membership list before proceeding with the election. However, the AFT has not produced any evidence to rebut Ms. Tinsley's assertion that the AFT already had access to the membership list it sought from the WTU. Therefore, the AFT could not have reasonably concluded that there was any immediate threat to these records or that it was necessary to take immediate action to "secure and safeguard" the WTU's membership list, which it already had in its possession.

With respect to the April 30 nominating petitions, it is undisputed that the WTU did not turn over the nominating petitions to the AFT's administrator, Albert Squire, until August 26—nine days after the emergency administratorship was imposed. *See* Second Squire Decl. ¶ 3. The AFT argues that it was necessary to take immediate action to recover the petitions because it was concerned about what had happened to those documents in light of President George Parker's failure to respond to Mr. Squire's requests for those documents. *See* Mem. P. & A. Supp. Def.'s Mot. for TRO and Prelim. Inj. at 7. However, there is nothing in Mr. Squire's declaration (signed on August 19) that shows any particular "concern" about the whereabouts or the safekeeping of the nominating petitions or indicates that there is any immediate threat to them. In fact, Mr. Squire states that "[t]he April 30 nominating petitions are in the possession of WTU, namely under the control of WTU President George Parker." Squire Decl. ¶ 7. Moreover, during the TRO hearing, counsel for the WTU noted that the WTU Executive Board passed a resolution at its June 9 meeting directing that the Executive Board maintain "all petitions submitted on April 30, 2010, for organizational records and legal purposes" and that this resolution was presented to the AFT's investigating committee as an exhibit during the July 21

hearing.  *See* Decl. of Anton G. Hajjar, Ex. B (Decl. of George Parker).[8]  Thus, the AFT knew

that the WTU Executive Board had directed that the nominating petitions be secured and

safeguarded.  Based on this record, the AFT has not shown that it had a reasonable basis to

believe that *immediate* action was necessary to "secure and safeguard" the nominating petitions

on August 17 when it declared an emergency trusteeship.

In summary, the AFT declared an emergency administratorship on August 17 despite the

fact that it already had possession of the WTU's June 30 membership list and was aware that

WTU President George Parker had possession of the April 30 nominating petitions in order to

safeguard them.  Because the AFT Constitution limits emergency administratorships to situations

in which there is a need for "immediate action for the purpose of securing and safeguarding an

affiliate's assets and vital records from *immediate threat*," the AFT's emergency

administratorship is invalid.  There was no "immediate threat" with respect to these records that

the AFT could reasonably have identified on August 17.

The other grounds asserted by the AFT for an administratorship—such as WTU's failure

to conduct a timely election—may be an appropriate basis for an administratorship after a fair

hearing is held on September 10 pursuant to Article VI, Section 15(b) of the AFT Constitution.

Accordingly, the Court shall not enjoin the AFT from proceeding with the September 10 hearing

and from determining whether an administratorship may be appropriate from that date forward.

However, the Court finds that the AFT is not likely to succeed on the merits of its emergency

---

[8] This resolution was submitted by the WTU as an exhibit following the TRO hearing.
*See* Decl. of Anton Hajjar, ECF No. [18].  The AFT's counsel informed the Court via telephone
(with counsel for both parties on the line) that it did not dispute the authenticity of this exhibit.
The AFT does dispute, however, whether there was a quorum at the June 9 meeting of the WTU
Executive Board, which is not relevant at this time to the Court's decision.

administratorship because it lacked a reasonable basis for believing that immediate action was necessary to secure and safeguard either the WTU's June 30 membership list or its April 30 nominating petitions from an immediate threat.

3.    The AFT's Decision and Order

The AFT seeks an order from this Court compelling the WTU to comply with the terms of the Decision and Order issued by the AFT Executive Council on August 4. Having concluded that the AFT has not shown a substantial likelihood of success as to the validity of its emergency administratorship, the Court must now determine whether the Decision and Order alone may provide an independent basis for injunctive relief or whether the AFT must impose an administratorship in order to take charge of the election.

The AFT's authority to issue the Decision and Order comes from Article VI, Section 14(b) of the AFT Constitution, which allows the AFT to "investigate a local or state federation where an election appears to have been conducted in violation of the local or state federation constitution, the AFT constitution or applicable federal law . . . ." The parties dispute whether Section 14(b) is limited to situations in which an election has already been conducted, i.e., *post*-election challenges. The AFT argues that the language in Section 14(b) may be reasonably construed as encompassing cases such as this one where a required election has not been held and that the Court should defer to its reasonable construction of that section. *See Monzillo v. Biller*, 735 F.2d 1456, 1458 (D.C. Cir. 1984) ("An interpretation of a union constitution rendered by officials of a labor organization is entitled to considerable deference by a reviewing court and should not be overruled unless the court finds that the interpretation was unreasonable or made in bad faith.") The Court need not reach this question, however, because it ultimately concludes

that in this case, on these facts, the Decision and Order cannot be enforced without imposing a trusteeship.

The AFT argues that Section 14(b) authorizes it to issue binding orders to local unions who have conducted unlawful elections. The AFT bases its authority on the contractual nature of its constitution with the local unions and the provision in Section 14(b) stating that the AFT Executive Council "shall have the power to take action to resolve the matter . . . ." The AFT also relies on an opinion by Judge Thomas Penfield Jackson in a prior election dispute between the AFT and the WTU in this Court. *See Am. Fed'n of Teachers v. Wash. Teachers' Union, Local #6*, No. 94-513, slip op. at 1-5 (D.D.C. Apr. 26, 1994). In that case, Judge Jackson relied solely on a prior version of Section 14(b) in granting an injunction that compelled the WTU to rerun its 1993 election. *See id.* at 3. The order that Judge Jackson enforced required the WTU to rerun its election under supervision from the Department of Labor. *Id.* at 4. As the AFT noted in its brief and during the TRO hearing, the version of the AFT Constitution before Judge Jackson did not contain any specific provisions relating to administratorships or trusteeships. Therefore, Judge Jackson was not asked to interpret the scope of Section 14(b)'s precursor in light of the specific administratorship provisions the AFT has since placed in Section 15 of Article VI of its constitution, and his decision does not address the present framework of the AFT's Constitution.

The problem with the AFT's August 4 Decision and Order is that it does not merely direct the WTU to conduct its election on a more expedited schedule. Rather, it states that "AFT will take charge of the 2010 internal election for the WTU." Immediately following that declaration, Albert Squire began to effectuate the AFT's takeover by sending out a notice of the new elections schedule to WTU members along with new nominating petitions; he also asked the

WTU to turn over to him the records necessary to conduct the election.  Therefore, the Decision and Order was not merely an *order* requiring the WTU to conduct the election in a certain manner; its practical effect is to impose a trusteeship on the WTU for the purpose of conducting an election.  *See* 29 U.S.C. § 402(h) ("'Trusteeship' means any receivership, trusteeship, or *other method of supervision or control whereby a labor organization suspends the autonomy otherwise available to a subordinate body* under its constitution or bylaws." (emphasis added)).  As AFT President Randi Weingarten recognized in her June 4 e-mail, "[t]he duly-elected Election Committee now has the responsibility for conducting the election of officers as described in the WTU constitution and bylaws."  Parker Decl., Ex. 8 (6/4/10 E-mail).  By taking over the Elections Committee's duties after the Decision and Order, the AFT was intruding on the WTU's autonomy without following the procedures required by the LMRDA for the establishment of a trusteeship.[9]  Indeed, the AFT implicitly recognized this when it invoked an emergency administratorship after the WTU refused to comply with the Decision and Order.  Therefore, the relief requested by the AFT in this case—an injunction allowing it to take charge of the WTU election—is different than the relief that Judge Jackson granted, which was an injunction requiring the WTU to rerun its election under the supervision of the Department of Labor.  The LMRDA requires labor organizations to strictly adhere to the procedural requirements for trusteeships contained in their constitutions and bylaws.  The Court shall not permit the AFT to carve out an exception, however limited, allowing it to assume control of the WTU election based on the AFT's purported authority to issue binding election orders pursuant to Section 14(b)

---

[9] The AFT concedes that its July 21 investigatory hearing does not satisfy the requirements for a fair hearing under 29 U.S.C. § 464(c).

of Article VI of the AFT Constitution.

The Court finds that the AFT is not likely to succeed on its claim that the Decision and Order is binding on the WTU without the imposition of an administratorship. The Court finds that the WTU has shown a substantial likelihood of success on the merits with respect to the invalidity of the emergency trusteeship and the AFT's efforts to enforce its Decision and Order without an administratorship. Accordingly, the Court shall deny the AFT's request for injunctive relief compelling the WTU to comply with the Decision and Order and other directives given by the AFT to conduct its election in accordance therewith. The Court finds that this factor weighs strongly in favor of a preliminary injunction against the AFT.

4.    Summary

The Court finds that the AFT has improperly imposed an emergency administratorship because it did not have reasonable grounds to believe that emergency action was necessary to safeguard and secure vital records of the WTU. The Court also finds that although the AFT Constitution may provide the AFT with authority in some cases to issue binding orders to conduct an election in a certain manner, the August 4 Decision and Order effectively imposes a trusteeship within the meaning of the LMRDA and therefore cannot be enforced unless the AFT imposes a valid administratorship in accordance with its constitution. In light of these findings, there is no need to consider whether the WTU is likely to succeed on its claim that the Decision and Order is generally invalid as a breach of contract. If the AFT ultimately imposes an administratorship after its September 10 hearing, the Court may revisit this issue upon proper motion. However, the Court does note that once an administratorship is established pursuant to proper procedures, the presumption of validity under 29 U.S.C. § 464(c) insulates it from attack

28

except upon clear and convincing evidence that it was not established or maintained in good faith or for an allowable purpose.

B.     *Irreparable Injury If the Preliminary Injunction/TRO Is Not Granted*

The WTU argues that it will suffer irreparable harm if the AFT is not preliminarily enjoined from interfering with the WTU's elections and the WTU's autonomy.  The Court agrees.  "It has been held that damage to a labor union's reputation and image constitute irreparable injury."  *Mason Tenders Dist. Council v. Laborers' Int'l Union*, 884 F. Supp. 823, 832 (S.D.N.Y. 1995).  If the AFT is not enjoined from continuing to interfere with the WTU's election, the WTU will be effectively deprived of its authority under the WTU Constitution to conduct its own elections.  Moreover, the AFT's interference will have the likely effect of creating confusion among the WTU membership about the deadlines for the upcoming elections and undermining the WTU leadership in the eyes of its members.  The AFT's attempts to intervene in the election began shortly after the Decision and Order was issued on August 4 and have continued through this litigation.  Thus, there is an imminent need for relief, and the Court finds that these are irreparable harms that cannot be remedied without a preliminary injunction.

C.     *Balance of Equities*

Under this factor, the Court must consider the balance of the equities and determine whether an injunction would more substantially injure other parties, such as the AFT.  The AFT argues that a preliminary injunction would cause irreparable harm to itself and its members because it would deprive the AFT of the ability to ensure that local affiliates' elections are conducted in accordance with their constitutions and with local and federal law.  Specifically, the AFT argues that granting the WTU's request for an injunction would "legitimize the actions of

incumbent officers in delaying constitutionally-mandated elections as a means of perpetuating themselves in office" and "profoundly undermine the role that AFT plays as the arbiter of permissible behavior by local union officers under its Constitution." *See* AFT's Opp'n at 16-17. The Court recognizes these as legitimate harms to the AFT. However, those harms must be harmonized with the dictates of the LMRDA and the procedural requirements of the AFT's own constitution and balanced against the WTU's presumptive autonomy in conducting its own affairs. Moreover, these harms to the AFT may be repaired if it ultimately imposes a valid administratorship following a fair hearing. Accordingly, the Court finds that the balance of the equities favors the issuance of a preliminary injunction against the AFT.

       *D.     Public Interest*

The final factor in considering whether to grant a request for injunctive relief is whether the public interest would be furthered by the injunction. The Court finds that an injunction will be in the public interest because it fulfills the LMRDA's aim of ensuring that proper procedures are followed prior to the imposition of trusteeships by labor organizations. The AFT argues that the public interest will not be served by an injunction because the LMRDA also requires local unions to conduct regularly scheduled elections and therefore there is a need for the AFT to ensure that the WTU's officers do not hold onto their positions longer than is necessary to conduct an election. The Court is appreciative of the AFT's concerns. However, the Court's preliminary injunction shall not require the election to be held according to the dates adopted by the WTU Executive Board. If the AFT validly imposes an administratorship after a fair hearing, it may conduct an election according to the schedule it deems most appropriate. Regardless of the schedule that ultimately governs the WTU's elections for officers, it will be untimely.

Therefore, the public's interest in ensuring a timely election will not be undermined by a preliminary injunction.

        *E.      Specific Requests for Injunctive Relief*

Having found that the four factors weigh in favor of granting the WTU's request for injunctive relief, the Court shall examine the WTU's specific requests for relief. Any injunction issued by the Court must be "narrowly tailored to remedy the harm shown." *Nat'l Treasury Employees Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990). The WTU seeks an order enjoining the AFT (and its officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with anyone described Rule 65(d)(2) of the Federal Rules of Civil Procedure and the Local Rules of this Court) from (1) conducting an election for officers, (2) contacting members of the WTU about the WTU election, (3) publicly commenting on the WTU election, (4) otherwise interfering with the internal affairs of the WTU, (5) imposing any kind of administratorship over the WTU with regard to any and all matters pertaining to the WTU's 2010 election of officers, and (6) otherwise complying with the AFT's Decision and Order. The WTU also seeks an order requiring the AFT to cease and desist its attempts to affirmatively require the WTU to turn over to the AFT all documents related to the election of WTU officers and permit the AFT access to teacher bulletin boards within the schools.

Based on the Court's rulings above, the Court finds that it is appropriate to preliminarily enjoin[10] the AFT from conducting an election for the WTU's officers, contacting members of the WTU about the WTU election, imposing an emergency administratorship over the WTU,

---

[10] Although the parties requested both TROs and preliminary injunctions, the Court finds that it is most appropriate to issue relief in the form of a preliminary injunction. There is no need to separately consider whether a TRO is appropriate.

requiring the WTU to turn over documents related to the election of WTU officers, and otherwise interfering with the WTU's authority to conduct its election for officers or complying with the Decision and Order. The Court shall not, however, preliminarily enjoin the AFT from publicly commenting on the WTU election, as this would interfere with the AFT's right to free speech under the First Amendment and the WTU has not shown a compelling need for a prior restraint. Because the Court has found that the AFT may have valid grounds for an administratorship following a fair hearing, which has been scheduled for September 10, the preliminary injunction shall expire upon the AFT's imposition of a valid administratorship pursuant to Article VI, Section 15(b) of the AFT Constitution, or upon the issuance of a final judgment in this action.

//

//

//

//

//

//

//

//

//

//

//

//

//

## IV.  CONCLUSION

For the foregoing reasons, the Court shall DENY the AFT's [5] Motion for a Temporary Restraining Order and Preliminary Injunction and GRANT-IN-PART and DENY-IN-PART the WTU's [6] Motion for a Preliminary Injunction and [9] Cross Motion for a Temporary Restraining Order.  The Court finds that the AFT has improperly imposed an emergency administratorship over the WTU and that the AFT's Decision and Order taking control of the WTU's election cannot be enforced without a properly established administratorship.  The Court also finds that the relevant factors weigh in favor of granting the WTU's request for injunctive relief.  Accordingly, the Court shall preliminarily enjoin the AFT from interfering with the WTU's election of officers until and unless it imposes a valid administratorship under the terms of the AFT Constitution.  An appropriate preliminary injunction order accompanies this Memorandum Opinion.


Date: September 1, 2010                                    _____/s/_____
                                                          **COLLEEN KOLLAR-KOTELLY**
                                                          United States District Judge